# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UTILISAVE, LLC, a Delaware Limited Liability Company, and MHS Venture Management Corp., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 7796-ML |
| MIKHAIL KHENIN | ) ) | |
| Defendant. | ) | |

## MASTER'S REPORT
(Plaintiffs' Motion for Partial Summary Judgment and
Defendant's Motion to Strike)


Draft Report:  February 4, 2014
Submitted on Exceptions:  May 11, 2015
Final Report:  August 18, 2015

John G. Harris, Esquire and David B. Anthony, Esquire of BERGER HARRIS LLP, Wilmington, Delaware; Attorneys for Plaintiffs.

Mikhail Khenin, appearing pro se.

LEGROW, Master

This lawsuit is the latest chapter in the story of a long-running, acrimonious dispute between the two co-managing members of Utilisave, LLC ("Utilisave"). Previous chapters were set in both the New York Supreme Court and in this Court and included the co-managers hurling at each other accusations of widespread wrongdoing, a judgment in New York against both co-managers, and a dissolution proceeding in Delaware that culminated in the appointment of a liquidating trustee and the sale of Utilisave to one of the co-managers. What remains to be resolved before any denouement are several claims between the parties, some of which are so trivial that the time and expense to litigate them must surely have consumed the value of any potential recovery. What is clear, if nothing else, is that the parties' mutual dislike has driven to the brink of trial a case that rational actors would long ago have settled.

The motion presently before me was filed by MHS Venture Management Corp. ("MHS") and Utilisave (collectively, the "plaintiffs"), and it seeks partial summary judgment on six of the nine counts alleged in the complaint, as well as on the defendant's two counterclaims. Ordinarily, summary judgment is an inefficient use of the parties' and the court's resources when trial is scheduled to occur very shortly. Although I considered denying the motion on that basis, it is apparent from the record that summary judgment is warranted on some of the claims on the basis of collateral estoppel and the unambiguous language in the governing

contract, and I remain hopeful that granting partial summary judgment where warranted will narrow and focus the parties' presentations at trial.

For the reasons that follow, I recommend that the Court grant in part and deny in part the plaintiffs' motion for summary judgment. I also recommend that the Court deny the defendant's motion to strike the plaintiffs' reply brief in support of their motion for summary judgment.

## BACKGROUND

### A. History

Plaintiff Utilisave is a Delaware limited liability company that audits utility bills to help customers, typically large business entities, find savings. Plaintiff MHS is wholly-owned and managed by Michael Steifman ("Steifman"). Steifman founded Utilisave in 1991, hired the defendant, Mikhail Khenin ("Khenin") in 1997, and elevated Khenin to CEO in 2003. MHS had a 50 percent membership interest in Utilisave, Khenin had a 40 percent interest, and Donna Miele ("Miele"), the President of Utilisave, had a 10 percent interest. Steifman and Khenin entered into an Amended and Restated Limited Liability Company Agreement of Utilisave (the "Operating Agreement") and separate employment agreements in 2006. Section 8.04 of the Operating Agreement provides that it is governed by Delaware law.

2

Under his employment agreement, Khenin pledged to "faithfully, diligently and competently use all reasonable efforts" to further Utilisave's business and "to devote his time and energy so that [Utilisave] [was] his primary business."[1] As CEO, Khenin was responsible for preparing an annual budget and business plan, maintaining the company's books and records, safeguarding Utilisave's funds, introducing new lines of business as necessary, and maintaining Utilisave's technology and information functions, among other things.[2] Khenin agreed to keep confidential certain information, including customer lists, and agreed that he would not remove any records, files, documents, or equipment from the Utilisave premises unless in furtherance of his duties.[3] For his services, Khenin was to be paid a salary of $289,000, which would be increased annually by the change in the Consumer Price Index.[4] Khenin also would receive substantial benefits, including a cell phone allowance, a company car, 25 days of paid vacation, payment for all religious holidays, a paid family health insurance plan, and an entertainment allowance.[5] By its express terms, Khenin's employment agreement expired on January 1, 2009, unless he was terminated for cause before that date.[6]

---

[1] Khenin Employment Agreement §§ 2.02(c), (d) (Pls.' Mot. Partial Summ. J. Ex. C).
[2] *Id.* §§ 2.02(a), (b), (e).
[3] *Id.* §§ 2.05, 2.06.
[4] *Id.* § 2.03(a).
[5] *Id.* § 2.03(c).
[6] *Id.* §§ 2.01, 3.01; *Steifman v. Khenin*, Index No. 14929/08 (N.Y. Sup. Ct. June 23, 2011) (Pls.' Mot. Partial Summ. J. Ex. A) (hereinafter "New York Decision").

Under the Operating Agreement, "[t]he power to manage the affairs of the company and to act on behalf of the company [was] vested exclusively in the Managing Members, acting unanimously." MHS and Khenin were the co-Managing Members of Utilisave and were required to act unanimously to take certain corporate actions, including paying Utilisave's expenses, opening bank accounts, investing cash held by Utilisave, and hiring employees or attorneys.[7] This meant that Khenin, even acting as CEO, could not take some actions without approval from MHS, which Steifman fully controlled. Certain other corporate actions, including approving employee compensation or capital expenditures, except for the salaries specifically agreed to in the employment agreements, required the consent of a majority of the members.[8] Furthermore, the Operating Agreement also provided that "[a]ll distributions will be made at the discretion of the majority of the Members."[9] Because MHS controlled a 50 percent interest in Utilisave, Khenin and Miele could not achieve the majority vote required to take these actions without approval from MHS. Under the Operating Agreement, no Member was permitted to have an interest in any business that directly competed with Utilisave.[10] The Operating Agreement also required each Member to keep confidential "data (including, but not limited to, financial information, customer

---

[7] Operating Agreement § 2.02 (Pls.' Mot. Partial Summ. J. Ex. B) (providing a list of actions that only may be taken by the managing members "acting unanimously").
[8] *Id.* § 2.03.
[9] *Id.* § 3.02.
[10] *Id.* § 5.04.

lists, techniques, audit issues, procedure and analysis)"[11] and not disclose confidential information to any unauthorized person or use it for its own account without the unanimous prior written consent of the other Members. This obligation explicitly survived the termination of Utilisave and also continued to be binding on a Member following the termination of its interest in Utilisave.[12]

The relationship between Steifman and Khenin soured in 2007, if not before, when Khenin began to exclude Steifman from the business. In a convoluted series of events that are not directly relevant to the pending motion, Khenin purported to fire Steifman and caused Utilisave to cease paying Steifman's salary and distributions that were owed to MHS. Khenin purported to extend his employment agreement unilaterally when it expired on January 1, 2009, and continued to serve as the de facto CEO of Utilisave until 2011. During that time, Khenin paid himself a salary and substantial benefits, hired attorneys on behalf of Utilisave, and caused Utilisave to prosecute claims against Steifman. On August 26, 2011, Khenin was removed from his position with Utilisave by order of this Court.

After he assumed sole control over Utilisave, Khenin unilaterally declared six distributions to Utilisave's members: (1) a $100,000 distribution in April 1, 2008, (2) a $250,000 distribution on March 27, 2009, (3) a $350,000 distribution on April 19, 2010, (4) a $200,000 distribution on July 23, 2010, (5) a $150,000

---

[11] *Id.* § 5.05.
[12] *Id.*

distribution in February 2011, and (6) a $200,000 distribution on June 23, 2011, two hours after the New York Court issued its post-trial decision.

## B. The New York Action

In 2007, MHS and Steifman filed a lawsuit against Utilisave and Khenin in the New York Supreme Court in Westchester County (the "New York Action"). MHS brought claims to recover unpaid distributions and to obtain a declaratory judgment that Khenin's unilateral extension of his Employment Agreement was unauthorized. Steifman brought claims for wrongful termination and breach of his Employment Agreement. Khenin and Utilisave brought seven counterclaims against Steifman and MHS for breaches of fiduciary duty, breach of the duty of good faith and fair dealing, indemnification or contribution, fraud and misrepresentation, and conversion.[13]

The following claims were pending in the New York Action by the time of trial:

- A claim by MHS against Utilisave for unpaid distributions.

- A claim by Steifman against Utilisave for wrongful termination and breach of Steifman's employment contract.

- A claim by MHS against Utilisave for the purported renewal of Khenin's employment contract.

- A counterclaim by Utilisave for breach of fiduciary duty against MHS and Steifman.

---

[13] Khenin's Am. Verified Answer with Countercls. (Pls.' Mot. Partial Summ. J. Ex. D).

- A counterclaim by Utilisave against Steifman for tortious interference with contractual relations.

- A counterclaim by Utilisave for disgorgement of salary from Steifman.

- A counterclaim by Khenin against MHS and Steifman for fraud and misrepresentation.[14]

A number of other claims and counterclaims were withdrawn or dismissed before trial, including a derivative claim against Khenin for breach of fiduciary duty for paying himself compensation after the employment agreement expired in 2009.[15] As to the claim for unpaid distributions, the first three distributions were at issue because Khenin withheld all or a portion of those distributions from MHS in order to fund Utilisave's defense of the New York Action. Before trial in New York, the parties also stipulated to the amount withheld from the fourth distribution, in July 2010, and the New York Court ultimately amended its post-trial decision to include that amount in its judgment.[16] MHS challenged in this action the validity of the distributions Khenin declared in July 2010, February 2011, and June 2011, arguing that Khenin could not unilaterally declare distributions under Section 3.03 of the Operating Agreement.

On June 23, 2011, Justice Alan D. Scheinkman issued his decision in the New York Action. Justice Scheinkman concluded that "[u]nder the Operating

---

[14] New York Decision at 2-3.

[15] New York Decision at 3; Plaintiffs' Second Amended Verified Compl. in New York Action ¶ 109 (Khenin's Opening Brief in Supp. of Exceptions to Draft Reports, Ex. C).

[16] *See Steifman v. Khenin*, Index No. 8271/07 (N.Y. Sup. Ct. July 21, 2011) (Decision and Order at Ex. M to Def.'s Opening Br. in Supp. of Exceptions to Draft Reports).

7

Agreement, Steifman and Khenin were to serve as co-managers. Hence, upon the expiration of both the Khenin and Steifman Employment Agreements, Khenin and Steifman were to be co-managers."[17] Therefore, the Court found that:

> Khenin's purported renewal of his Employment Agreement, which expired by its terms on January 1, 2009, for an additional three year term was ineffectual because under the Operating Agreement, the managing members had to agree unanimously to renew Khenin's Employment Agreement. Accordingly, Plaintiff is entitled to a declaratory judgment that the January 2009 Employment Agreement is without force and effect based on Utilisave's lack of authority to enter into it without the consent of MHS.[18]

Justice Scheinkman also concluded that Khenin wrongfully withheld portions of MHS's distributions in April 2008, March 2009, and April 2010 in order to fund Utilisave's defense of the New York Action. In reaching his conclusions, Justice Scheinkman interpreted Section 3.03 of the Operating Agreement to provide that "the making of distributions is discretionary," not mandatory, under the Operating Agreement.[19]

In an act of comity to this Court, Justice Scheinkman did not determine the damages based on Khenin's ineffective attempt to renew the employment

---

[17] New York Decision at 58; *see also id.* at 20 ("[U]nder the Operating Agreement, Khenin and Steifman were co-managing members who were required to act jointly."); *id.* at 57 ("Further, the clear and unambiguous language of sections 2.01 and 2.02 is that in order to enter into any other agreements of employment, such action required the unanimous consent of the two managing members — Khenin and MHS.").

[18] *Id.* at 58-59.

[19] *Id.* at 48 ("Under the Operating Agreement, while the making of distributions is discretionary, once the making of a distribution was decided upon, it was mandatory that the distributions be made to the members pro rata to their membership interests." (citing Operating Agreement § 3.03 (Pls.' Mot. Partial Summ. J. Ex. B))).

8

agreement or any issues related to the validity of Khenin's various actions, which were the subject of stayed claims in Delaware.[20] The distributions that Khenin declared in July 2010, February 2011, and June 2011 were not challenged in the New York Action, but the parties to that action stipulated to the amount improperly withheld from the July 2010 distribution and the Court therefore revised its opinion and order to reflect that additional amount that was owed to MHS.[21]

There was no perfected appeal from the New York Court's decision and Justice Scheinkman's decision is the final judgment in the New York Action.

## C. Prior Court of Chancery Rulings

There also have been multiple actions in this Court between the parties. The first was a Petition for Dissolution of Utilisave, which was filed by MHS on March 24, 2009 but was stayed pending resolution of the New York Action.[22] When the stay was lifted, Chancellor Strine appointed a New York attorney, Michael Allen, Esquire, to serve as liquidating trustee of Utilisave (the "Trustee").[23] The Trustee found Utilisave's books and records in disarray and noted that "a significant amount of work likely would be required to enable Utilisave to file accurate 2010

---

[20] *Id.* at 59.
[21] *Steifman v. Khenin*, Index No. 14929/08 (N.Y. Sup. Ct. July 21, 2011) (Khenin's Opening Brief in Supp. of Exceptions to Draft Reports, Ex. C).
[22] *See In the Matter of Utilisave*, C.A. No. 4441-CS (hereinafter "Dissolution Action").
[23] Dissolution Action, Order Appointing Liquidating Trustee for Utilisave, LLC (Aug. 26, 2011).

tax returns," which were due on September 15, 2011.[24] On August 30, the Trustee appointed Steifman as interim CEO to manage Utilisave's day-to-day operations.[25] The tax returns were timely filed on September 15, 2011.

On or before February 15, 2012, Khenin wrote to the Trustee to request that Utilisave make a distribution to the members. The Trustee wrote to Steifman and Miele to ask their position about the request. Miele replied that, in her opinion, it was "not prudent to do a distribution to the Members right now."[26] Steifman replied that he was "strongly against the distribution" and argued that it would be "inappropriate, uncalled for and with no basis."[27] Thereafter, the Trustee informed Khenin that he had determined not to make a distribution to the members because he did not have majority approval for it.[28] On March 29, 2012, Khenin again requested that the Trustee make a distribution to the members. The Trustee again refused, stating he believed "that a distribution to the Members [was] not in the Company's best interest."[29]

---

[24] Dissolution Action, Liquidating Trustee's Mot. for Approval of Transaction and to Dismiss, Trustee's Report at 2 (Apr. 24, 2012).

[25] *Id.* at 4.

[26] E-mail Exchange Between Michael Allen, Liquidating Trustee, and Donna Miele, President, Utilisave (Feb. 15-16, 2012) (Pls.' Mot. Partial Summ. J. Ex. Y).

[27] E-mail from Michael Steifman, Acting CEO, Utilisave, to Michael Allen, Liquidating Trustee (Feb. 16, 2012) (Pls.' Mot. Partial Summ. J. Ex. Z).

[28] Letter from Michael Allen, Liquidating Trustee, to Alisa E. Moen, Esquire, Counsel to Defendant (Feb. 16, 2012) (Pls.' Mot. Partial Summ. J. Ex. AA).

[29] E-mail Exchange Between Michael Allen, Liquidating Trustee, and Mikhail Khenin (Mar. 28-30, 2012) (Pls.' Mot. Partial Summ. J. Ex. X).

Once the taxes were finished, the Trustee also moved forward with his efforts to sell Utilisave or its assets. To minimize uncertainty among Utilisave's employees and avoid having to share confidential information with bidders during the sales process, the Trustee suggested "that the parties consider a process in which a valuation expert values the company as a going concern and one of the Members agrees to purchase the Company for that value."[30] Khenin objected to a valuation and instead demanded that a market check be performed. The Trustee hired Eureka Capital Markets LLC ("Eureka") to help oversee the sales process. Eureka contacted eight potential third-party purchasers about bidding. MHS was the only party to submit a bid by the March 16, 2012 deadline. The Trustee contacted Khenin after the deadline to determine whether Khenin wanted to submit a bid, but Khenin declined.

The Trustee issued his report and plan of distribution on April 24, 2012, recommending the sale of Utilisave as a going concern to MHS.[31] Under Section 6.05 of the Operating Agreement, MHS enjoyed a priority claim to all proceeds from the sale of the company until MHS received $5.25 million in cumulative distributions. At the time of the sale, $3,434,500 remained of that priority claim. Under the terms of the proposed sale, MHS would purchase all the assets and

---

[30] Dissolution Action, Liquidating Trustee's Mot. for Approval of Transaction and to Dismiss, Trustee's Report at 8 (Apr. 24, 2012).
[31] *Id.* at 11.

liabilities of Utilisave in exchange for waiving both its priority claim and any legal claims it or Steifman had against Utilisave. Khenin objected to the sale and argued that only dissolution of Utilisave was permitted. In rejecting Khenin's opposition and granting the Trustee's proposed order, the Chancellor explained that "[t]his Court has made clear that in these kind of proceedings the purpose is to do an economically productive resolution of the end game of a corporation and that the form is not critical."[32] The Chancellor also noted that "[f]rankly, I dealt with this before. It's law of the case. It was my intent that the liquidating trustee have the full range of flexibility to maximize value."[33] The Chancellor granted the Trustee's motion to approve the transaction and dismiss the dissolution action on July 9, 2012. The transaction closed the same day.[34] MHS is now the sole owner of Utilisave.

Less than two months later, Utilisave and MHS initiated this lawsuit against Khenin. In response, Khenin filed a complaint on October 19, 2012, seeking advancement of his fees and expenses incurred in defense of this action.[35] Chancellor Strine granted Utilisave's motion for summary judgment and dismissed Khenin's advancement claim on April 9, 2013.[36] The Chancellor noted that the

---

[32] Dissolution Action, (July 9, 2012) (TRANSCRIPT) at 34.

[33] *Id.* at 40.

[34] Dissolution Action, Order Granting Liquidating Trustee's Mot. for Approval of Transaction and to Dismiss (July 9, 2012).

[35] *See Khenin v. Utilisave*, C.A. No. 7967-CS (hereinafter "Advancement Action").

[36] Advancement Action, Order Governing Parties' Cross-Motions for Summ. J. (Apr. 16, 2013).

New York judge determined that Khenin only would be entitled to advancement "in the absence of a judgment or final adjudication that Khenin acted in bad faith, was dishonest, or personally gained profit to which he was not entitled."[37] Chancellor Strine recognized that Justice Scheinkman found in the New York Action that:

> Khenin did not act reasonably; that a rational person could not have believed that he had the authority as the sole manager to extend his own contract and to give himself a pay increase without the assent of the appropriate number of members necessary to take action; and that he did so for self interested reasons.[38]

Chancellor Strine held that this decision "constitute[s a] binding and final judgment that Mr. Khenin acted in bad faith, was dishonest, or personally gained profit to which he was not entitled."[39] The Chancellor therefore determined that Khenin was precluded under principles of estoppel from receiving advancement.[40]

The plaintiffs filed an Amended Verified Complaint (the "Complaint") on December 31, 2012. At the same oral argument on April 9, 2013, Chancellor Strine also ruled on a motion for judgment on the pleadings with respect to Khenin's counterclaim that Steifman breached the Operating Agreement by failing to make a distribution after Steifman was appointed CEO. Chancellor Strine held that a counterclaim alleging that Steifman had a duty as CEO to make a

---

[37] Advancement Action, (Apr. 9, 2013) (TRANSCRIPT) at 20
[38] *Id.* at 23.
[39] *Id.* at 24.
[40] *Id.*.

13

distribution pursuant to Section 3.03 of the Operating Agreement was "dismissible as a matter of law as an unreasonable reading of the [O]perating [A]greement."[41] Chancellor Strine explained that a claim based on allegations that Steifman had the authority under Section 3.03 to make distributions unilaterally "would have been inconsistent with the plain language of the [O]perating [A]greement."[42] The Chancellor dismissed the counterclaim without prejudice and gave Khenin leave to replead. Khenin did so, filing the two counterclaims presently at issue.

### D. Overview of the Case

Utilisave and MHS's Complaint alleges nine counts against Khenin. Khenin filed his Second Amended Verified Counterclaim (the "Counterclaim") on April 24, 2013. The plaintiffs filed a Motion for Partial Summary Judgment on November 23, 2013, seeking resolution with respect to liability only for Counts I-V and IX of the Complaint, as well as Khenin's two counterclaims. Khenin filed a motion to strike the plaintiffs' reply brief on January 14, 2013, arguing the brief was not timely filed. This report resolves both motions.

### ANALYSIS

Under Court of Chancery Rule 56, summary judgment may be granted if there are no genuine, material issues of fact in dispute and the moving party is

---

[41] *Id.* at 33-34.
[42] *Id.* at 34.

entitled to judgment as a matter of law.[43]  When considering a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving party.[44]  Neither party has an absolute right to summary judgment.[45]  A party seeking summary judgment bears the initial burden of showing no genuine issue of material fact exists.[46]  If the movant makes such a showing, the burden then shifts to the non-moving party to submit sufficient evidence to show that a genuine factual issue, material to the outcome of the case, precludes judgment before trial.[47]  The purpose of summary judgment is to avoid the delay and expense of a trial where there is nothing for the fact finder to decide.[48]  It is appropriate for courts to resolve disputes over the meaning of contractual language on a motion for summary judgment where there is only one reasonable interpretation of the language in question.[49]

---

[43] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012); *Alcott v. Hyman*, 208 A.2d 501, 506 (Del. 1965); *In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 473 (Del. Ch. 2000); *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007).

[44] *Williams v. Geier*, 671 A.2d 1368, 1375 (Del. 1996); *Judah v. Delaware Trust Co.*, 378 A.2d 624, 632 (Del. 1977); *United Rentals v. RAM Hldgs., Inc.*, 937 A.2d 810, 829 (Del. Ch. 2007).

[45] *Brunswick Corp. v. Bowl-Mor Co.*, 297 A.2d 67, 69 (Del. 1972).

[46] *Johnson v. Shapiro*, 2002 WL 31438477, at *3 (Del. Ch. Oct. 18, 2002).

[47] *Conway v. Astoria Fin. Corp.*, 837 A.2d 30, 36 (Del. Ch. 2003) (citing *Scureman v. Judge*, 626 A.2d 5, 10 (Del. Ch. 1992), *aff'd*, 628 A.2d 85 (Del. 1993)); *Johnson*, 378 A.2d at 632.

[48] *In re Maull*, 1994 WL 374302, at * 2 (Del. Ch. June 9, 1994) (citing *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 100 (Del. 1992)).

[49] *United Rentals*, 937 A.2d at 830.

The doctrine of collateral estoppel is designed to provide repose and put a definite end to litigation.[50] "Under ... [this] doctrine, where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action. In such situation, a party is estopped from relitigating the issue again in the subsequent case."[51] Thus, the doctrine of collateral estoppel prevents the relitigation of an issue previously decided.[52] As I will discuss, earlier rulings in New York and this Court have resolved liability, although not damages, as to some of the counts in the Complaint.

## A. The Plaintiffs' Claims

### 1. Breach of Fiduciary Duty of Loyalty (Count I)

The plaintiffs allege that Khenin breached his fiduciary duty of loyalty to Utilisave by incorporating a new business called Benchmarking Solution Services, Inc. ("Benchmarking") under his own name, issuing all authorized shares in Benchmarking to himself, and arranging for Benchmarking's bank statements to be mailed to Khenin's home address.[53] Benchmarking was incorporated on March 22, 2011. Steifman discovered the bank account after he was appointed as interim CEO of Utilisave, and Steifman informed the Trustee about Benchmarking shortly

---

[50] *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1991).
[51] *Tyndall v. Tyndall*, 238 A.2d 343, 346 (Del. 1968); *see also Messick v. Star Enter.*, 655 A.2d 1209, 1211 (Del. 1995) (quoting *Taylor v. State*, 402 A.2d 373, 375 (Del. 1979)).
[52] *Playtex*, 584 A.2d at 1216.
[53] Compl. ¶ 54.

16

before the Trustee's initial meeting with Khenin.  The Trustee did not specifically ask Khenin about Benchmarking, but Khenin disclosed the existence of the Benchmarking bank account when the Trustee asked a general question about company bank accounts.  The Trustee recovered approximately $30,000 that was in the Benchmarking account.

Khenin admits that he opened Benchmarking for himself.[54]  The plaintiffs claim that, by doing so, Khenin usurped a corporate opportunity of Utilisave.  The corporate opportunity doctrine provides that:

> a corporate officer or director may not take a business opportunity for his own if:  (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation."[55]

The determination of whether a corporate officer has usurped a corporate opportunity is a fact-intensive inquiry.[56]

There are very few facts in the record about what Benchmarking does.  Although the plaintiffs contend that Benchmarking is within Utilisave's line of

---

[54] Khenin Dep. 239:1-3; 241:6 (July 31, 2013).

[55] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154-55 (Del. 1996).

[56] *Id*. at 155 ("Hard and fast rules are not easily crafted to deal with such an array of complex situations."); *Johnston v. Greene*, 121 A.2d 919, 923 (Del. 1956) ("Whether or not a director has appropriated for himself something that in fairness should belong to the corporation is 'a factual question to be decided by reasonable inference from objective facts.'") (quoting *Guth v. Loft*, 5 A.2d 503, 513 (Del. 1939)).

17

business,[57] Khenin argues that Benchmarking was "unrelated" to anything Utilisave did and "had nothing to do with utility bill auditing."[58] Furthermore, Khenin claims that he "discussed it with Miele and she agreed that this type of business does not compete with" Utilisave.[59] Khenin says that he later transferred Benchmarking to Utilisave as a "gift"[60] because it was taking up too much of his time, but the plaintiffs argue that the transfer was not effective until it was ordered by the Court on July 9, 2012.[61] The plaintiffs point out that the seamless integration of Benchmarking into Utilisave shows that Benchmarking's operations are within Utilisave's line of business.[62]

On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. What the foregoing makes clear is that there are disputed issues of fact about whether Benchmarking was a corporate opportunity of Utilisave, to say nothing of the factual issues respecting what, if any, damages the plaintiffs may be able to prove. Even if the plaintiffs establish at trial that Khenin breached his fiduciary duty of loyalty to Utilisave by establishing Benchmarking in his own name, the usual remedy for usurpation of corporate opportunity is calculated based on the lost profits that were diverted to the other

---

[57] Pls.' Reply Supp. Mot. Partial Summ. J. 12.
[58] Def.'s Opp'n Mot. Partial Summ. J. 6.
[59] *Id.*
[60] *Id.*
[61] *Id.* at 14; Dissolution Action, Order Granting Liquidating Trustee's Mot. for Approval of Transaction and to Dismiss ¶ 7 (July 9, 2012).
[62] Pls.' Reply Supp. Mot. Partial Summ. J. 13.

business or by the profits generated by the other business that otherwise would have flowed to the company.[63] The plaintiffs have not even suggested that Utilisave lost any business to Benchmarking, and the Trustee already has recovered the approximately $30,000 that was in Benchmarking's bank account.[64] Furthermore, Khenin testified that "all this money belonged to Utilisave and [he] never took even one penny from this"[65] and the plaintiffs have not contradicted Khenin's testimony. Plaintiffs' insistence on pressing this claim unfortunately is emblematic of the type of "gotcha" litigation tactics that have pervaded the parties' history.

In short, there are material issues of fact with respect to liability that preclude summary judgment on this claim, and I remain mystified that the plaintiffs continue to devote time and resources to pressing what appears, at this point, to be a valueless cause of action.

## 2. Breach of Contract for Unauthorized Salary (Count II)

In the second count of the Complaint, the plaintiffs allege that Khenin breached the Operating Agreement by paying himself unauthorized salary and benefits after his Employment Agreement expired on January 1, 2009.[66] As discussed, Justice Scheinkman found that Khenin's unilateral renewal of his

---

[63] *See, e.g.*, *Dweck v. Nasser*, 2012 WL 161590, at *17-18 (Del. Ch. Jan. 18, 2012).
[64] Compl. ¶ 54.
[65] Khenin Dep. 239:17-21 (July 31, 2013).
[66] Compl. ¶¶ 76-79.

expired Employment Agreement was unauthorized and ineffectual under the Operating Agreement.[67] Khenin does not dispute that he paid himself a salary of over $300,000 in 2009, 2010, and 2011, in addition to medical, retirement, and other benefits. Khenin also does not claim that he sought or obtained the consent and approval of a majority of the members — as required under the Operating Agreement[68] — before paying himself this compensation. Principles of collateral estoppel therefore require entry of summary judgment in the plaintiffs' favor on this part of Count II, because there are no material facts in dispute as to liability.

In his exceptions to my draft summary judgment report, Khenin argued that the plaintiffs' argument misstates, and my reading misunderstands, Justice Scheinkman's ruling in the New York Action. Respectfully, Khenin misunderstands the plaintiffs' claim. The plaintiffs' position is based on their contention that Section 2.03 of the Operating Agreement requires unanimous approval of the members before payment of, among other things, executive compensation and expenditures in excess of $100,000.[69] It is this contract, and not the employment agreement, that plaintiffs contend Khenin breached. Because the New York Court previously determined that Khenin's renewal of the employment

---

[67] New York Decision at 54-59.
[68] Operating Agreement § 2.03.
[69] *See id*. § 2.03 (11), (12).

agreement was not authorized,[70] Khenin's payment of a salary to himself after January 1, 2009 was a breach of Section 2.03 of the Operating Agreement.

Khenin also argues for the first time in his exceptions to the draft summary judgment report that the plaintiffs' claim itself is barred by principles of collateral estoppel because the plaintiffs brought a derivative claim against Khenin in the New York Action for breach of fiduciary duty relating to the payment of Khenin's salary after January 1, 2009. This argument is disjointed, but I ultimately need not consider its merits because I conclude Khenin waived this defense by failing to plead it in his answer, raise it before trial, or file at any time a motion to amend his answer.[71]

As the plaintiffs acknowledge, the amount of damages owed for this claim is not ripe for summary judgment. In the New York Action, Justice Scheinkman noted that there is "no requirement … that an officer or manager of a company has to have an employment agreement in order to receive payment for services rendered" and therefore it is possible "that Mr. Khenin can establish that he did provide services and the amount that he received for compensation for those

---

[70] New York Decision at 56-59.

[71] Ct. Ch. R. 8(c), 12(b); *Knutkowski v. Cross*, 2011 WL 6820335, at *2 (Del. Ch. Dec. 22, 2011).

services was reasonable."[72]  The issue of damages was addressed at trial and is resolved in the post-trial final report, issued contemporaneously herewith.

The plaintiffs also allege as part of Count II that Khenin cashed out too many unused vacation days and gave himself over $83,000 in paid time off ("PTO").[73]  In their motion for summary judgment, the plaintiffs further contend that Khenin paid himself for too many religious holidays.[74]  The Operating Agreement and Khenin's lapsed Employment Agreement make no mention of cashing out unused PTO, but Khenin concedes that he also was subject to the provisions of Utilisave's Employee Handbook.[75]  Justice Scheinkman did not address the PTO issue in the New York Action.

If the policy was laid out clearly in the Employee Handbook, I could grant summary judgment on this claim.  Unfortunately, the Employee Handbook is poorly drafted and internally inconsistent.  At page 21, the Handbook allows an employee to "'carryover' or cashout of *any* unused Paid Time Off days," and at page 23 it provides that employees "may carry over *up to five* unused days from one year to the next, and/or [] may 'cash out' *any* unused days at a pay out of 100% of [their] current daily wage."[76]  Those provisions appear to conflict with page 24 of the Employee Handbook, which allows employees "to carry over *up to*

---

[72] New York Action Trial Tr. 412:14-25 (Def.'s Opp'n Mot. Partial Summ. J. Ex. D).
[73] Compl. ¶ 80.
[74] Pls.' Mot. Partial Summ. J. 14.
[75] Khenin Dep. 200:5-12 (July 31, 2013).
[76] Employee Handbook at 21, 23 (Pls.' Mot. Partial Summ. J. Ex. H) (emphasis added).

22

*five* days of PTO to the next calendar year" or "cash-out *up to five* unused PTO days at a payout of 100% of [their] current daily wage."[77]  The Employee Handbook also notes that "[a]ny unused PTO days that are in excess of the Carry-Over maximum and are not Cashed-Out, will be forfeited."[78]  Khenin argues that the internal inconsistencies indicate that the document is fraudulent, but the record does not support an inference that the handbook was fabricated.  The contradictions do, however, render the meaning of the Employee Handbook ambiguous and preclude judgment as a matter of law on this part of Count II.  The parties will have an opportunity to present evidence at trial regarding how the Employee Handbook was interpreted by Utilisave's managers.

### 3. Breach of Contract for Unauthorized Legal Expenses (Count III)

In Count III, the plaintiffs allege that Khenin breached the Operating Agreement by using Utilisave funds to pay his attorneys' fees incurred in prosecuting personal claims against MHS and Steifman in the New York Action. Section 2.08 of the Operating Agreement provides:

> "To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Member … from and against any loss or expense … including … reasonable attorney's fees and other costs or expenses incurred in connection with the *defense* of any actual or threatened action or proceeding, provided that such loss or expense was incurred in connection with actions taken pursuant to authority reasonably thought to have been granted pursuant to this agreement....

---

[77] *Id.* at 24 (emphasis added).
[78] *Id.*

23

The Company shall advance to the Indemnified Party reasonable attorney's fees and other costs and expenses incurred in connection with the *defense* of any action or proceeding which arises out of such conduct."

Pointing to the emphasized language, the plaintiffs argue that indemnification of legal expenses only was available to defend claims or counterclaims, not to prosecute personal claims. The plaintiffs also allege that Khenin improperly permitted attorneys representing both Utilisave and Khenin to commingle fees, rather than segregating fees between claims.

Khenin made a similar argument against Steifman in the New York Action, where he argued that "the Operating Agreement does not provide for indemnification of attorneys' fees incurred in bringing claims against Utilisave or any of its members."[79] Khenin also admitted in his deposition that Utilisave was not responsible for paying the attorneys' fees associated with his personal counterclaims against Steifman and MHS,[80] and conceded that he is obligated to

---

[79] Defs.' Opp'n to Pls.' Mot. to Disqualify Counsel in New York Action, at 12 (Pls.' Mot. Partial Summ. J. Ex. E); *id.* at 13 ("It would be inappropriate to compel Utilisave to pay the attorney [sic] fees Steifman incurs in this action because such an order would circumvent the restriction of indemnification in the Operating Agreement to fees incurred in defending, not prosecuting claims."). The plaintiffs, however, maintain that this issue was not decided in the New York Action. *See* Letter from John G. Harris, Esquire, Counsel to Plaintiffs, to the Court (Jan. 24, 2014).

[80] Khenin Dep. 316:2-9 (July 31, 2013) ("Q. Was it your understanding that the company was responsible for paying the attorneys fees associated with your personal counterclaims against Mr. Steifman and MHS? A. Absolutely not, and I told very clearly that if they find that Ed Beane include some of the charges against that claim that this should be reimbursed to company.").

24

reimburse Utilisave for any attorneys' fees associated with his personal counterclaims.[81]

Khenin initially filed several counterclaims against MHS and Steifman in the New York Action,[82] but by the time of trial those counterclaims were reduced to a single claim against MHS and Steifman for allegedly fraudulently inducing Khenin to sign the Operating Agreement. Khenin was represented during the New York Action by Keane & Beane, P.C., who also represented Utilisave on certain claims and defenses in the New York Action. Despite Khenin's testimony that he instructed his attorneys to segregate their time working on his personal counterclaims from their time working on his defense,[83] the plaintiffs presented evidence that the attorneys at Keane & Beane did not differentiate between the two types of expenses on their invoices.[84] This is enough to meet the plaintiffs' initial burden of showing no genuine issue of material fact, and the burden shifts to Khenin to submit sufficient evidence to show that a genuine factual issue precludes judgment on this claim. Khenin testified that he personally paid some of the

---

[81] *Id.* at 317:14-18 ("Q. As you sit here today do you believe you have any obligation to reimburse the company for the funds used to pay the attorneys fees associated with your personal counterclaim? A. Definitely.").

[82] Khenin's Am. Verified Answer with Countercls. (Pls.' Mot. Partial Summ. J. Ex. D).

[83] Khenin Dep. 315:3-8 (July 31, 2013).

[84] *See, e.g.*, Invoices from Keane & Beane (Pls.' Mot. Partial Summ. J. Ex. F) (for example, billing 3.5 hours for "[c]ombine documents [from] Second Joint Answer …; prepare Third Amended Answer with Counterclaims" or 0.5 hours for "[r]eview opposition papers in Delaware proceeding, transcript; attorneys conference re new counterclaims" or 2.25 hours for "[p]reparation of amended answer; review e-mails re counterclaims; attorneys' conference re amendment and MHS as party").

attorneys' fees to Keane & Beane, but he was unable to recall the exact amount he paid and was unable to provide any proof of payment.[85] Whether or not Khenin reimbursed Utilisave for any of the expenses for prosecuting his personal counterclaims is a factual issue of damages that will be addressed at trial. I find that the plaintiffs have demonstrated that at least some of Utilisave's funds were improperly used to prosecute Khenin's personal counterclaims, and I recommend that the Court grant summary judgment on Count III only as to liability. The exact amount of damages, if any remain, will be determined at trial.

### 4. Breach of Contract for Unauthorized Distributions (Count IV)

The plaintiffs further allege in Court IV that Khenin breached the Operating Agreement by unilaterally issuing distributions during 2010 and 2011 without authorization from a majority of the members. Section 3.03 of the Operating Agreement provides that:

> All distributions will be made at the discretion of the majority of the Members. It will be presumed that cash in excess of required working capital will be distributed unless there is a compelling reason to accumulate additional cash reserves. Any distributions to the Members (other than a liquidating distribution upon the sale of all or substantially all of the Company, or any Special Distribution approved by all the Members) will be made to the Members pro-rata in accordance with their relative Participating Percentages.

Khenin argues that the second sentence of Section 3.03 should be interpreted to mean that when a majority vote cannot be obtained, the distribution of all excess

---

[85] Khenin Dep. 311:15-312:20 (July 31, 2013).

cash is required, and as CEO he had the authority unilaterally to make that decision.[86]

Justice Scheinkman already has interpreted Section 3.03 to provide that "the making of distributions is discretionary," not mandatory,[87] but he also explicitly noted that he "did not determine … any issues related to the validity of Khenin's actions." [88] Chancellor Strine, however, explained that an interpretation of Section 3.03 that would give the CEO authority to make distributions unilaterally "would have been inconsistent with the plain language of the operating agreement,"[89] which required approval by a majority of the members.

Khenin consistently has argued that both the New York Court and Chancellor Strine misinterpreted Section 3.03, and that the only logical reading of that section is that the first sentence – requiring a vote of a majority of Utilisave's members – applies only to "discretionary" distributions, while the balance of that section applies to "mandatory" distributions, which shall occur whenever there is cash in excess of required working capital.[90] Khenin's argument ignores the two earlier decisions by both the New York Court and this Court, which compel the

---

[86] Def.'s Opp'n Mot. Partial Summ. J. 29-30.

[87] New York Decision at 48 ("Under the Operating Agreement, while the making of distributions is discretionary, once the making of a distribution was decided upon, it was mandatory that the distributions be made to the members pro rata to their membership interests." (citing Operating Agreement § 3.03 (Pls.' Mot. Partial Summ. J. Ex. B))).

[88] New York Decision at 59.

[89] Advancement Action, (Apr. 9, 2013) (TRANSCRIPT) at 34.

[90] Def.'s Opening Br. in Supp. of Exceptions to Draft Reports at 23-25.

conclusion that no distributions could be issued without MHS's approval. Khenin concedes he did not obtain majority approval before issuing the distributions. I therefore conclude that summary judgment must be granted on Count IV as to liability.

Even if I did not conclude that Khenin was collaterally estopped from making this argument, my own independent reading of Section 3.03 compels the conclusion that the challenged distributions were not authorized and therefore improper. Khenin's interpretation of Section 3.03, although convenient to justify his actions in making distributions without the approval of a majority of Utilisave's members, contradicts the plain language of the Operating Agreement. It is elemental that this Court construes all contracts by seeking to determine the intent of the parties.[91] When language in a contract is clear and unambiguous, this Court will ascertain the parties' intent by according the language its plain and ordinary meaning.[92]

The unambiguous language of Section 3.03 provides that *all* distributions, other than a liquidation distribution address in a separate section of the Operating Agreement, are discretionary and only may be made upon the approval of a majority of the company's members. The remainder of the paragraph explains a

---

[91] *Andrews v. McCafferty*, 275 A.2d 571, 573 (Del. 1971).
[92] *Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010); *Emerging Europe Growth Fund, L.P. v. Figlus*, 2013 WL 1250836, at *4 (Del. Ch. Mar. 28, 2013).

"presumption" that the parties agreed would apply in determining the amount of the discretionary distributions. This reading of the contract accords the language its ordinary meaning and avoids rendering any provision or term illusory.[93]  In contrast, Khenin's interpretation of Section 3.03 would render the first sentence of the section illusory by permitting a distribution, other than a liquidating distribution, without the approval of a majority of Utilisave's members.  In addition, Khenin's reading would require the addition of other words that appear nowhere in that section, such as "mandatory" or "shall."  In addition, although Khenin contends that distributions in excess of required working capital were mandatory in the event of a deadlock between the members, the section does not contain any mention of a deadlock.  In short, Khenin's reading is little more than a self-serving, *post hoc* justification for his actions and is not consistent with the language in the contract.

In his exceptions to the draft report, Khenin argues that the plaintiffs' claims are barred by principles of estoppel because the New York Court, in its July 21, 2011 decision, included in the amount of the judgment the amount withheld from the July 2010 distribution.  Khenin argues that the New York Court "thereby recognize[ed] the validity of the July 2010 distribution," which constitutes "incontestable evidence that the July 2010 distribution did not breach Section 3.03

---

[93] *Osborn*, 991 A.2d at 1159.

of the Operating Agreement."[94]  Khenin argues by extension that the May and July 2011 distributions therefore were authorized by the New York Court as well.  This argument fails for two independent reasons.  First, Mr. Khenin did not raise the issue of estoppel until post-trial briefing and did not seek at any point to amend his answer to include that defense.  The collateral estoppel defense therefore has been waived.[95]  Second, the New York Court's decision expressly disclaimed any conclusions regarding the validity of Khenin's actions.  In fact, when Khenin moved to dismiss this claim on the basis of judicial estoppel, Chancellor Strine rejected that argument, specifically concluding that Steifman had not raised, and the New York Court had not addressed, the validity of the distributions.[96]

Although the plaintiffs demonstrated that Khenin made several distributions that were unauthorized by the operating agreement, and the plaintiffs therefore are entitled to summary judgment as to that portion of the claim, the amount of damages, if any, caused by the unauthorized distributions required factual testimony at trial.  As briefly explained in the post-trial report, I ultimately concluded that the plaintiffs had not shown that Utilisave was harmed by the distributions and I therefore recommended that the Court award nominal damages of $1.00.  The plaintiffs did not take exception to that recommendation.

---

[94] Def.'s Opening Br. in Supp. of Exceptions to Draft Reports at 21.
[95] Ct. Ch. R. 8(c), 12(b); *Knutkowski v. Cross*, 2011 WL 6820335, at *2 (Del. Ch. Dec. 22, 2011).
[96] *Utilisave v. Khenin*, C.A. No 7796 (Jan. 11, 2012) (TRANSCRIPT) at 38-42.

30

## 5. Breach of Contract for Misuse of Confidential Information (Count V)

The plaintiffs also claim that Khenin breached a provision of the Operating Agreement that prohibited the disclosure or personal use of the Company's confidential information. Section 5.05 of the Operating Agreement states that:

> Each Member acknowledges that the information, observations and data (including, but not limited to, financial information, customer lists, techniques, audit issues, procedure and analysis) obtained by it while a Member of the Company concerning the affairs of the Company ("Confidential Information") are the property of the Company. Therefore, each member agrees that … it shall not disclose to any unauthorized person or use for its own account any Confidential Information without the unanimous prior written consent of the other Members.

Although Khenin originally denied having Utilisave files outside the office,[97] Steifman notified the Trustee on November 1, 2011 that he had discovered, through conversations with Utilisave's employees, that Khenin had downloaded confidential information, including copies of the company's data retrieval database and two important proprietary software programs, onto a computer and servers that Khenin then took to his home.[98] The plaintiffs allege that Khenin breached Section 5.05 when he made those copies. Khenin says that the information was on a personal computer, but the plaintiffs claim that the equipment was the property of another business wholly-owned by Khenin,

---

[97] Dissolution Action, Liquidating Trustee's Mot. for Approval of Transaction and to Dismiss, Trustee's Report at 6 (Apr. 24, 2012).

[98] E-mail from Michael Steifman to Michael Allen, Liquidating Trustee (Nov. 1, 2011) (Def.'s Opp'n Mot. Partial Summ. J. Ex. GG).

Venergex LLC, which the plaintiffs believe was set up to compete against Utilisave.[99] The Trustee investigated, and decided to hire Synthesis Technology Group ("Synthesis"), a forensic IT specialist, to delete the files from Khenin's computer, which cost Utilisave over $30,000.[100] Khenin permitted Synthesis to come to his home to delete the files, and the Trustee acknowledged that he was "reasonably certain that Synthesis was able to delete from the Venergex server the relevant Utilisave files," although he had no way of knowing whether other copies had been made.[101]

Khenin does not deny that he had a copy of the Company's database and proprietary software at his home, but he claims that it was merely a backup "in case of an emergency or disaster."[102] Khenin claims that he had been making such backups on a weekly basis since 2005[103] and that other Utilisave employees knew about those backups.[104] Khenin notes that the backups always were made after business hours when other employees are not accessing the database or using the software.[105] Khenin also states that he did not disclose the information to anyone or use the information in an improper fashion. Khenin cites testimony from the

---

[99] Compl. ¶¶ 57-58.
[100] *Id.* ¶ 60.
[101] Dissolution Action, Liquidating Trustee's Mot. for Approval of Transaction and to Dismiss, Trustee's Report at 6 (Apr. 24, 2012).
[102] Def.'s Opp'n Mot. Partial Summ. J. 34.
[103] *Id.*
[104] *Id.* at 39.
[105] *Id.* at 41.

32

Trustee that there was no evidence that Khenin had done so and that Khenin cooperated with the forensic IT specialist to delete the files.[106] Khenin claims that Venergex has never had any business operations and has no customers or employees.[107]

The plaintiffs' claim rests on Section 5.05 of the Operating Agreement, which provides that Khenin "shall not disclose … or use" the confidential information. Mere possession of the copied information is not enough to constitute a breach of that section. Khenin denies disclosing the information to anyone else or using the information himself for any improper purpose, and there are disputed issues of fact regarding whether Khenin ever did so. In fact, the plaintiffs have not identified any specific instances of disclosure or use of the confidential information. Instead, the plaintiffs seem to admit that "Khenin's misappropriation was found out before he could use Utilisave's trade secrets to his advantage."[108] I do note that the Trustee "did not find Khenin's explanation credible."[109] On a motion for summary judgment, however, the evidence must be viewed in the light most favorable to the nonmoving party, and as a result I am unable to conclude that the plaintiffs are entitled to judgment as a matter of law on this claim.

---

[106] *Id.* at 38, 40 (citing the Trustee's deposition).
[107] *Id.* at 41.
[108] Pls.' Reply in Supp. Mot. Partial Summ. J. 17.
[109] Dissolution Action, Liquidating Trustee's Mot. for Approval of Transaction and to Dismiss, Trustee's Report at 6 (Apr. 24, 2012) (Pls.' Mot. Partial Summ. J. Ex. G).

### 6. Misappropriation of Trade Secrets (Count IX)

The plaintiffs' claim for misappropriation of trade secrets relies on the same facts as Count V, and summary judgment is not appropriate for principally the same reason. The misappropriation claim is based on the Delaware Uniform Trade Secrets Act (DUTSA).[110] Liability under the DUTSA may be established by demonstrating:

1) The existence of a trade secret as defined in the statute;
2) Communication of the secret by the plaintiff to the defendant;
3) The communication was pursuant to an express or implied understanding that the secrecy of the matter would be respected; and
4) The secret information has been improperly used or disclosed by the defendant to the injury of the plaintiff.[111]

A trade secret is defined in DUTSA as:

Information, including a formula, pattern, compilation, program, device, method, technique or process that [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[112]

---

[110] 6 *Del. C.* §§ 2001-2009.

[111] *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *5 (Del. Ch. Apr. 5, 2005), *aff'd*, 913 A.2d 569 (Del. 2006); *Savor, Inc. v. FMR Corp.*, 2004 WL 1965869, at *5 (Del. Super. July 15, 2004); *Wilmington Trust Co. v. Consistent Asset Mgmt., Inc.*, 1987 WL 8459 (Del. Ch. Mar. 25, 1987).

[112] 6 *Del. C.* § 2001(4); *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *5 (Del. Ch. Apr. 5, 2005), *aff'd*, 913 A.2d 569 (Del. 2006).

A plaintiff bears the burden of establishing both the existence and misappropriation of a trade secret.[113] If a plaintiff can demonstrate "wilful or malicious appropriation," DUTSA also permits an award of exemplary damages[114] and attorneys' fees.[115]

The plaintiffs have established that Utilisave's unique propriety software meets the definition of a trade secret, because it took years of work to develop and has significant economic value to Utilisave.[116] Khenin concedes as much.[117] Utilisave's client list also may constitute a trade secret, because it is difficult to determine the appropriate contact with utility-related authority in a large institution and thus the information would have economic value to a competitor.[118] Khenin admits that the client list is confidential and does not argue it is not a trade secret.[119] Utilisave's billing information is perhaps a closer question, but it also may constitute a trade secret since it will reveal some of Utilisave's methodology.[120] Khenin again admits that the billing information is confidential

---

[113] *Agilent Tech, Inc. v. Kirkland*, 2010 WL 610725, at *17-18 (Del. Ch. Feb. 18, 2010).
[114] 6 *Del. C.* § 2003(b) ("If wilful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award [of actual damages].").
[115] 6 *Del. C.* § 2004 ("If … wilful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party.").
[116] Pls.' Mot. Partial Summ. J. 38-39; Steifman Aff. ¶¶ 3-8 (Pls.' Mot. Partial Summ. J. Ex. U).
[117] Khenin Dep. 292:11-16 (July 31, 2013).
[118] Pls.' Mot. Partial Summ. J. 39; Steifman Aff. ¶¶ 9-10 (Pls.' Mot. Partial Summ. J. Ex. U).
[119] Khenin Dep. 295:12-16 (July 31, 2013).
[120] Pls.' Mot. Partial Summ. J. 39-40; Steifman Aff. ¶¶ 11-13 (Pls.' Mot. Partial Summ. J. Ex. U).

and does not argue in his Opposition that the billing information is not a trade secret.[121]

Nonetheless, I conclude that other material factual issues preclude summary judgment on this claim, namely whether the plaintiffs can establish the fourth element of their cause of action. Khenin argues that he did not take the information for an improper purpose because it only was intended to be an emergency backup, and claims he did not actually use the trade secrets for any purpose. This is not to say the plaintiffs cannot prevail at trial; "'[m]isappropriation of trade secrets may be proven by circumstantia[l] evidence,' and more often than not, 'plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place.'"[122] But when the evidence is viewed in the light most favorable to the nonmoving party, the plaintiffs have failed to demonstrate with undisputed facts that "[t]he secret information has been improperly used or disclosed by the defendant …," particularly given the plaintiffs' admission that "Khenin's misappropriation was found out before he could use Utilisave's trade secrets to his advantage." In addition, the plaintiffs struggle to articulate any injury

---

[121] Khenin Dep. 296:22-297:2 (July 31, 2013).
[122] *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706 (Del. Ch. Apr. 5, 2005), *aff'd*, 913 A.2d 569 (Del. 2006).

suffered from Khenin's actions, with the possible exception of the costs of the forensic IT specialist.[123] I therefore cannot conclude that the plaintiffs are entitled to summary judgment on this count.

## B. Khenin's Counterclaims

### 1. Breach of Sections 3.03 and 6.04 of the Operating Agreement

Both Khenin's counterclaims relate to distributions he claims are due to him from Utilisave. Khenin's first counterclaim has two parts. First, Khenin claims that Utilisave was required to make a distribution during the pendency of the Dissolution Action, pursuant to Section 3.03 of the Operating Agreement, which states that:

> All distributions will be made at the discretion of the majority of the Members. It will be presumed that cash in excess of required working capital will be distributed unless there is a compelling reason to accumulate additional cash reserves. Any distributions to the Members (other than a liquidating distribution upon the sale of all or substantially all of the Company, or any Special Distribution approved by all the Members) will be made to the Members pro-rata in accordance with their relative Participating Percentages.

Khenin argues that, by the time Steifman was appointed as acting CEO, Utilisave had accumulated cash in excess of required working capital, and therefore it should have been distributed to the members. Khenin testified that the three members used $350,000 as the required minimum operating capital before a distribution was

---

[123] 6 *Del. C.* § 2003(a) ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.").

made.[124] Miele, however, stated that they had agreed to maintain at least twice that amount, $700,000, before a distribution was made.[125] Either way, Utilisave had accumulated approximately $800,000 in cash, and so Khenin argues that a distribution should have been made. To this end, in mid-February 2012, Khenin made a request to the Trustee to issue a distribution.[126] After consulting Utilisave's other members,[127] the Trustee refused to do so and provided reasons for his decision to accumulate additional cash reserves.[128] Specifically, the Trustee reasoned that Utilisave "may have significant sales and liquidation-related expenses going forward and may require funds to prosecute the claims that it may decide to pursue … . It may also be required to defend against claims brought against it."[129]

I find on the basis of collateral estoppel that summary judgment must be granted to the plaintiffs and this part of Khenin's first counterclaim must be dismissed. Justice Scheinkman, in the New York Action, already has interpreted Section 3.03 of the Operating Agreement and determined that distributions were

[124] Khenin Dep. 114:12-115:10 (July 31, 2013).
[125] E-mail Exchange Between Michael Allen, Liquidating Trustee, and Donna Miele, President, Utilisave (Feb. 15-16, 2012) (Pls.' Mot. Partial Summ. J. Ex. Y).
[126] E-mail Exchange Between Michael Allen, Liquidating Trustee, and Mikhail Khenin (Mar. 28-30, 2012) (Pls.' Mot. Partial Summ. J. Ex. X).
[127] E-mail Exchange Between Michael Allen, Liquidating Trustee, and Donna Miele, President, Utilisave (Feb. 15-16, 2012) (Pls.' Mot. Partial Summ. J. Ex. Y); E-mail from Michael Steifman, Acting CEO, Utilisave, to Michael Allen, Liquidating Trustee (Feb. 16, 2012) (Pls.' Mot. Partial Summ. J. Ex. Z).
[128] Letter from Michael Allen, Liquidating Trustee, to Alisa E. Moen, Esquire, Counsel to Defendant (Feb. 16, 2012) (Pls.' Mot. Partial Summ. J. Ex. AA).
[129] *Id*.

discretionary.[130]    Furthermore, Chancellor Strine previously held that any counterclaim alleging that there was a duty to make a distribution pursuant to Section 3.03 of the Operating Agreement was "dismissible as a matter of law as an unreasonable reading of the [O]perating [A]greement."[131]  Principles of collateral estoppel prevent me from reaching a different conclusion.

Khenin also argues that Utilisave paid a final distribution of $15,016 to Miele in December 2012, five months after the transaction closed.  Khenin notes that his and Miele's interests in Utilisave were canceled in the sale to MHS, so she had no right to any distribution.  Pointing to Justice Scheinkman's finding in the New York Action that "while the making of distributions is discretionary, once the making of a distribution was decided upon, it was mandatory that the distributions be made to members pro rata to their membership interests," Khenin argues that he also is entitled to his pro rata share of any distribution.[132]  Steifman states that the payment to Miele was not a distribution, but was merely a "bonus in recognition of her dedication, experience and good work" that was booked as a distribution by Utilisave's new accountant.[133]  Although the timing of this payout to Miele is somewhat curious, the inescapable fact is that MHS fully owned Utilisave at the

---

[130] New York Decision, at 48.
[131] Advancement Action, (Apr. 9, 2013) (TRANSCRIPT) at 33-34.
[132] New York Decision at 48.
[133] Pls.' Reply Supp. Mot. Partial Summ. J. 24.

time of the payment to Miele, and could decide to pay distributions or bonuses to its employees in its discretion.

The second part of Khenin's first counterclaim alleges that Utilisave breached Section 6.04 of the Operating Agreement, which provides that:

> Upon dissolution of the Company a proper accounting shall be made by the company's accountants of the Company's assets, liabilities and operations from the date of the last previous accounting to the date of dissolution. Net income, gain and loss realized subsequent to the date of dissolution shall be allocated and distributed in accordance with Article III hereof.

The accounting and distribution required by Section 6.04 of the Operating Agreement, however, occur only upon a dissolution of Utilisave.

Notwithstanding Khenin's steadfast belief that a dissolution of Utilisave took place, the undisputed facts and previous rulings of this Court require the opposite conclusion. When Chancellor Strine appointed the Trustee, his Order gave the Trustee "the maximum authority permitted under the Act to wind up the affairs of [Utilisave], including but not limited to the authority to determine the form of transaction(s) pursuant to which the Company's affairs will be wound up."[134] The Trustee elected to negotiate a sale of Utilisave to MHS. When the Trustee filed his Motion for Approval of Transaction on April 24, 2012, he noted that "[b]ecause of the form of the Transaction, it will not be necessary to file a

---

[134] Dissolution Action, Order Appointing Liquidating Trustee for Utilisave, LLC, at 1 (Aug. 26, 2011).

40

certificate of cancellation for Utilisave, which will continue as a going concern."[135]

Khenin objected to the form of the transaction and argued that Utilisave must be dissolved. Chancellor Strine heard oral argument on the motion on July 9, 2012, and ruled from the bench that dissolution was not required.[136] Utilisave continues as a going concern to this day. Because Utilisave was not dissolved, Section 6.04 of the Operating Agreement is not applicable and no distribution is due to Khenin.

### 2. Breach of Section 6.05 of the Operating Agreement

Khenin's second counterclaim alleges that Utilisave breached Section 6.05(c) of the Operating Agreement by failing to distribute the company's remaining assets — including approximately $800,000 cash and $2.9 million in accounts receivable as determined by the Trustee's final accounting — to the members pro rata after the sale. MHS purchased all the assets and liabilities of Utilisave in the sale in exchange for waiving its priority claim to any proceeds contained in Section 6.05(b). Khenin argues that to receive the priority, MHS must actually provide cash consideration for the assets. I find that Khenin's interpretation of the Operating Agreement is unreasonable. Chancellor Strine previously determined that forcing MHS to actually pay the money to purchase Utilisave, when any amount up to $3.4 million would immediately go directly back

---

[135] Dissolution Action, Liquidating Trustee's Mot. for Approval of Transaction and to Dismiss, at 3 (Apr. 24, 2012).
[136] Dissolution Action, (July 9, 2012) (TRANSCRIPT) at 40.

into its own pocket, would elevate form over substance and generate unnecessary transaction costs.[137] This counterclaim therefore fails as a matter of law because there were no remaining assets to distribute after the sale, and summary judgment should be entered for the plaintiffs on this counterclaim.

Khenin argues, however, that the sale of Utilisave to MHS did not extinguish his claim under Section 6.05, pointing out – correctly – that the Court's order approving the sale of Utilisave to MHS specifically stated it was without prejudice to Khenin's claims against Utilisave, including his claims for distributions.[138] Khenin therefore posits that the Court's order approving the sale must not have extinguished Khenin's claims under Section 6.05 because "[i]f Chancellor Strine approved the sale transaction including the sale of all cash on hand to [p]laintiffs, th[e]n his order, which preserved [Khenin's] right for claims for distribution does not make sense, because in this case, there is nothing to distribute.[139] Khenin therefore argues that Utilisave's cash on hand and accounts receivable were assets available for distribution after the sale to MHS and, because Steifman waived his priority claim in connection with the sale, the priority claim

---

[137] *Id.* at 24-38.
[138] Dissolution Action, Order Approving Transaction and Discharging Trustee (July 9, 2012).
[139] Khenin's Opening Br. in Supp. of Exceptions to Draft Reports at 51.

42

does not reduce the assets available for distribution, which Khenin calculates at $2,777,940.65.[140]

This argument ignores the record in this case and the Court's previous findings – including my findings after trial from which Khenin benefited – and lacks persuasive force. To review, after Utilisave was marketed to potential bidders, MHS made the only bid. That bid was for a waiver of MHS's priority claim of $3.4 million and MHS's claims against Utilisave valued at more than $300,000.[141] Although no formal valuation of Utilisave was conducted, the investment banker retained by the Trustee placed a value on the company at or "slightly more" than MHS's priority claim.[142] In exchange for the consideration it offered, MHS acquired all Utilisave's assets and its liabilities, which necessarily included cash on hand and accounts receivable.[143]

The distribution contemplated under Section 6.05 of the Operating Agreement applies only to "the remaining assets of the [c]ompany" after a winding up or a sale of all or substantially all of the assets. In other words, if all of the assets of the company are sold, as was the case here, there is nothing left to distribute under Section 6.05. Although Khenin contends that such a conclusion is illogical in light of the Court's order dismissing the Dissolution Action without

---

[140] *Id*. at 53.
[141] Dissolution Action, July 9, 2012 (TRANSCRIPT) at 8, 11; PX 40 at 10 n.6.
[142] Dissolution Action, July 9, 2012 (TRANSCRIPT) at 31.
[143] *Id.* at 6, 15-16.

43

prejudice to Khenin's claims for a distribution, there is no logical disconnect there. Rather, the Court approved the sale without prejudice to the claims and without making any finding as to the merit of the claims.[144] To conclude, as Khenin urges, that MHS bought the assets subject to a claim that those assets were "remaining assets" available for distribution under Section 6.05 would contradict the bargain struck between the Trustee and MHS and approved by the Court. In other words, MHS paid consideration to acquire all of the assets (and liabilities) of the company and there is nothing left to distribute under Section 6.05.

It also is notable that Khenin has not disputed my factual finding after trial that the value of Utilisave at the time of sale was approximately equal to the amount MHS paid for the company.[145] That conclusion benefited Khenin because it formed the basis of my conclusion that the plaintiffs had not shown any damages resulting from the unauthorized distributions Khenin made. That factual conclusion must be applied consistently, however, and by failing to take exception to it, Khenin cannot dispute that MHS paid complete value for the entire company, including all its assets, leaving nothing for distribution to the members.

---

[144] *Id*. at 39-40.

[145] *See Utilisave, LLC v. Khenin*, C.A. No. 7796-ML, Jan. 12, 2015 (TRANSCRIPT) at 26-27. As I explained in my draft post-trial report, I concluded that, had Khenin not made the unauthorized distributions in 2010 and 2011, those funds would have been available at the time Utilisave was sold and likely would have been distributed under Section 6.05. In other words, Khenin effectively previously received the distribution to which he would have been entitled under Section 6.05.

**C. Khenin's Motion to Strike the Plaintiffs' Reply Brief.**

On January 14, 2014, Khenin filed a motion to disallow consideration of the plaintiffs' summary judgment reply brief because it was untimely under the parties' scheduling order. The plaintiffs maintain that there was some confusion regarding the scheduling order. The resolution of motions to strike is left to my discretion,[146] and in this case, I do not find that considering the late filing will cause any material prejudice to Khenin.[147] None of the arguments raised in the Reply present new issues that have not been explored adequately in earlier briefing. Furthermore, during the run up to trial, both parties were equally tardy, if not negligent, in their compliance with the scheduling order. Although the plaintiffs' motion for summary judgment will not resolve all the issues in the case, it will help the parties to focus their presentations at trial. I therefore decline to strike the plaintiffs' reply as untimely.

**CONCLUSION**

For the foregoing reasons, I recommend that the Court grant the plaintiffs' motion for partial summary judgment with respect to Counts II, III, and IV, as well as for both of Khenin's counterclaims. I also recommend that the Court deny the

---

[146] *Topps Chewing Gum, Inc. v. Fleer Corp.*, 1986 WL 538, at *1 (1986) (noting that "the granting of such a motion is permissive, not mandatory, and therefore a court must exercise its own judgment").

[147] *Quereguan v. New Castle Cnty.*, 2010 WL 2573856, at *5 (Del. Ch. June 18, 2010) ("The test employed in determining a motion to strike is: (1) whether the challenged averments are relevant to an issue in the case and (2) whether they are unduly prejudicial.") (quoting *Salem Church (Del.) Assocs. v. New Castle Cty.*, 2004 WL 1087341, at *2 (Del. Ch. May 6, 2004)).

plaintiffs' motion with respect to Counts I, V, and IX.  Finally, I recommend that the Court deny Khenin's motion to strike the plaintiffs' reply.  This is my final report on the matter.

Respectfully submitted,

/s/ *Abigail M. LeGrow*
Master in Chancery