James J. CONWAY, Jr., Plaintiff,

v.

**ASTORIA FINANCIAL CORPORATION,**
Defendant.

**C.A. No. 19499.**

Court of Chancery of Delaware,
New Castle County.

Submitted: April 14, 2003.
Decided: July 16, 2003.

---

Michael D. Goldman, Richard L. Renck, Potter Anderson & Corroon, Wilmington; Thomas P. Puccio, Law Offices of Thomas P. Puccio, New York City; Lawrence S. Robbins, Arnon D. Siegel, Robbins, Russell, Englert, Orseck & Untereiner, LLP, Washington, DC, for Plaintiff.

Alan J. Stone, Megan E. Ward, Morris, Nichols, Arsht & Tunnell, Wilmington; Michael L. Hirschfeld, Mathew B. West, Daniel M. Perry, Milbank, Tweed, Hadley & McCloy, LLP, New York City, for Defendant.

### OPINION AND ORDER

LAMB, Vice Chancellor.

#### I.

This action arises under a regulation adopted by the predecessor of the Office of Thrift Supervision, a bureau of the United States Department of the Treasury. That regulation was promulgated in 1969, in order to make uniform the director and officer indemnification practices of federally chartered savings associations. In this case, a former corporate officer who engaged in substantial misconduct in office seeks indemnification for his attorneys' fees and expenses relating to a class action resulting from his misconduct. This unquestioned malefactor refused to become a party to a stipulation of settlement that, nevertheless, resulted in the dismissal of all claims against him with prejudice. The question presented is whether by the simple ploy of refusing to participate in the settlement that greatly benefited him, the former officer can convert his indemnification claim from one that is permissive under the federal regulation to one that is mandatory. After examining the language, structure and purpose of the regulation, the court concludes that the claimant's refusal to participate in the settlement has no effect on the basis for his claim for indemnification. Because the judgment of dismissal was, conclusively, the product of a good faith settlement, the claim for indemnification is entirely permissive in character.

#### II.

Astoria Financial Corporation ("AFC"), a Delaware corporation, is a bank holding

company. AFC owns, among others, Astoria Federal Savings and Loan Association ("Astoria Federal"), the successor by merger of Long Island Savings Bank ("LISB" or the "Bank").[1] James J. Conway, Jr. was the Chairman of the Board of Trustees of LISB from 1976 until July 1993 and was the Chief Executive Officer of LISB from 1983 until July 1993.

During his tenure with LISB, Conway maintained an ownership interest in Conway & Ryan, P.C. (the "Law Firm"). Conway initially held 65% of the Law Firm stock. In December 1984, he transferred 51% of the Law Firm stock to his daughter, Susan Conway Petrelli, and 5% to his other partners, leaving Conway with 9%. In January 1987, Petrelli transferred half of her interest, 25.5% of the Law Firm stock, to her sister-in-law, Denise Whelan Conway ("Whelan"). From 1982 until 1992, LISB was the Law Firm's primary client. The Law Firm represented LISB in most residential mortgage loan transactions. The fees from the mortgage transactions accounted for more than 90% of the Law Firm's revenues.

Despite performing no client-related work for the Law Firm in 1982 or thereafter, Conway received nearly $4 million from the Law Firm. Petrelli, a recent law school graduate when she joined the Law Firm in 1984, received approximately $5 million from the Law Firm between 1985 and 1989. Whelan, also a junior attorney when she joined the Law Firm, received over $2 million from the Law Firm between 1987 and 1989. A portion of the money received by Petrelli and Whelan was spent at the direction or for the benefit of Conway.

## A. Conway's Scheme Is Revealed

In 1989, in connection with certain litigation, LISB's attorneys ("Outside Counsel") performed a due diligence investigation into LISB officers' compensation and perquisites. Outside Counsel met with Conway as part of this work in March 1990, at which time Conway revealed details of his and his family's financial relationship with the Law Firm. In September 1990, Conway asserted that his communications with Outside Counsel were privileged and warned Outside Counsel that he would take legal action against them if they disclosed the communications to LISB. At the suggestion of Outside Counsel, a special committee of the LISB board was formed to investigate the relationship among Conway, members of his family, and the Law Firm. Conway and his family members refused to cooperate with the investigation, and Outside Counsel declined to cooperate in light of Conway's contention that his communication to Outside Counsel was privileged.

In April 1992, the LISB board passed a resolution directing Outside Counsel to disclose the substance of the information that Outside Counsel had gathered concerning Conway's relationship with the Law Firm.[2] Outside Counsel informed Conway that Outside Counsel intended to

---

1. LISB was initially organized as a mutual savings bank under New York law. In 1982, LISB was reorganized as a federally chartered mutual savings bank under Section 5 of the Home Owner's Loan Act of 1933, 48 Stat. 128, as amended, 12 U.S.C. §§ 1461–1470 (2001). In February 1994, LISB reorganized again, changing from mutual ownership to stock ownership, but remaining a federally chartered savings bank. Concurrently, a new entity, Long Island Bancorp ("LIB"), a holding company under Delaware law, was formed to serve as LISB's parent. In September 1998, LIB merged with AFC, with AFC the surviving corporation. Concurrently, LISB merged with AFC's subsidiary Astoria Federal, with Astoria Federal the surviving entity.

2. At the time, Conway was still the CEO and Chairman of the Board of Directors of LISB.

comply with the resolution. Conway commenced *Doe v. Poe* on May 15, 1992, to prevent Outside Counsel from disclosing the information. The trial court found that Conway could not have reasonably expected the communications to be confidential from the LISB board.[3] Conway's appeals were rejected[4] and, on June 21, 1993, the information from Outside Counsel became available to the LISB board.

### B. *The OTS Disciplinary Proceeding*

On February 12, 1993, the United States Office of Thrift Supervision ("OTS"), the federal agency with regulatory jurisdiction over federally chartered thrift institutions such as LISB, began a formal investigation into Conway's relationship with the Law Firm. On February 24, 1994, Conway settled the OTS Disciplinary Proceeding, agreeing to an OTS Order in which the OTS stated that it had found from 1983 through 1989 Conway had failed to make required disclosures to LISB, its mutual members, and the Federal Home Loan Bank Board ("FHLBB").[5] The OTS concluded in its Order, as follows:

> [Conway] engaged in violations of federal conflict-of-interest and disclosure regulations, participated in conflicts of interest constituting an unsafe or unsound

practice within the meaning of [relevant OTS regulations], and breached his fiduciary duty owed to [LISB].[6]

Pursuant to 12 U.S.C. §§ 1818(b) and (e), the OTS Order imposed, and although admitting no wrongdoing Conway accepted, a lifetime ban on participation in the banking industry. Conway also was ordered to pay $1,300,000 in restitution to LISB.

### C. *The Criminal Case*

In 1994, the United States Attorney for the Eastern District of New York began a criminal investigation into Conway's payments from the Law Firm. In February 1998, Conway entered into a plea bargain in which he pled guilty to a criminal misdemeanor information charging him with violating 18 U.S.C. § 215(a)(2).[7] As part of the plea agreement, Conway paid a $200,000 fine and was placed on probation.[8]

### D. *The Weil Action*

The *Weil* Action, captioned *Weil v. Long Island Savings Bank*, began in March 1994,[9] shortly after an article about the OTS Order appeared in a Long Island newspaper and came to the attention of class counsel.[10] The class, consisting of more than 36,000 persons who had entered

---

**3.** *Doe v. Poe*, 189 A.D.2d 132, 595 N.Y.S.2d 503 (N.Y.App.Div.1993), *lv. denied*, 81 N.Y.2d 711, 600 N.Y.S.2d 442, 616 N.E.2d 1104 (1993).

**4.** *Doe*, 600 N.Y.S.2d 442, 616 N.E.2d at 1104.

**5.** The FHLBB was replaced by the OTS in 1989.

**6.** Ward Aff., Ex. 21.

**7.** The misdemeanor information charged that Conway had:

> knowingly, intentionally and corruptly solicited, demanded, accepted and agreed to accept ... funds from the Law Firm paid directly to him, which were derived from the attorneys' fees that were paid to the

> Law Firm by LISB when borrowers closed their loans, intending to be influenced and rewarded in connection with the business and transactions of LISB, to wit: the assignment of the LISB residential mortgage closing work to the Law Firm.

Ward Aff., Ex. 22, ¶ 6.

**8.** Compl., ¶ 19.

**9.** 188 F.Supp.2d 258 (E.D.N.Y.2002). The complaint incorrectly refers to March 1993, but all subsequent briefs refer to March 1994.

**10.** Jeanne Dugan Cooper, *"Bank's Ex–Chairman Censured; Veteran of Long Island Savings Banned from Industry,"* Newsday 37, Mar. 3, 1994.

into residential mortgages with LISB between 1983 and 1992, filed the suit against LISB, Conway, other members of the LISB board, and members of the Law Firm, alleging violations of federal statutes including the Racketeer Influenced and Corrupt Organization Act ("RICO"), the Truth in Lending Act, and the Real Estate Settlement Procedures Act ("RESPA") as well as common law claims for fraud and negligent supervision, among others. The complaint alleged that Conway, members of his family, the Law Firm, LISB, and the other members of the LISB board had engaged in a scheme to defraud members of the class by charging inflated legal fees in connection with residential mortgage closings that were used to fund kickbacks to Conway and his family from January 1, 1983 through December 31, 1992.[11]

On November 7, 2001, all parties to the *Weil* Action except Conway executed a stipulation of settlement (the "*Weil* Stipulation") in which LISB agreed to pay a large monetary settlement on the condition that the claims against all defendants, including Conway, be dismissed. The *Weil* Stipulation recites that the dismissal with prejudice of the action as to all parties, including Conway, was effected "pursuant to the Settlement reached by the parties."[12]

Conway did not object to the dismissal of claims against him, although he now asserts that he refused to join the settlement because he was determined to pursue his defense. On November 13, 2001, Conway entered into a separate stipulation with LISB and others, providing, among other things, as follows:

[Conway] does not oppose approval of the settlement embodied in the [*Weil* Stipulation], including but not limited to the dismissal with prejudice of the action as against him, as specified in paragraph 14 of the [*Weil* Stipulation], and Conway will file no papers and offer no argument in opposition to the preliminary and final approval of the [*Weil* Stipulation].[13]

In this stipulation, AFC agreed that the settlement did not bar Conway from seeking indemnification.

On January 16, 2002, the federal district court approved the settlement and entered an order dismissing with prejudice the claims against Conway.[14]

### E. The Indemnification Request

On January 15, 2002, Conway made a written request to the AFC board of directors and Astoria Federal board of directors for indemnification pursuant to the OTS's indemnification regulation (the "Indemnification Regulation"). The Indemnification Regulation provides, in relevant part, as follows:

A Federal savings association shall indemnify its directors, officers, and employees in accordance with the following requirements:

\* \* \*

(b) General. Subject to paragraph[ ] (c) . . . a savings association shall indemnify any person against whom an action is brought or threatened because that person is or was a director, officer, or employee of the association, for:

(1) Any amount for which that person becomes liable under a judgment if [sic] such action; and

(2) Reasonable costs and expenses, including reasonable attorney's fees actually paid or incurred by that person in

---

11.  *Weil*, 188 F.Supp.2d at 260.

12.  Ward Aff., Ex. 26, ¶ 14.

13.  Ward Aff., Ex. 27, ¶ 2.

14.  *See Weil*, 188 F.Supp.2d at 265.

defending or settling such action ... if he or she attains a favorable judgment in such enforcement action.

(c) Requirements. Indemnification shall be made to such person under paragraph (b) of this section only if:

(1) Final judgment[15] on the merits is in his or her favor; or

(2) In case of:

(i) Settlement,

(ii) Final judgment against him or her, or

(iii) Final judgment in his or her favor, other than on the merits,

if a majority of the disinterested directors of the savings association determine that he or she was acting in good faith within the scope of his or her employment or authority as he or she could reasonably have perceived it under the circumstances and for a purpose he or she could reasonably have believed under the circumstances was in the best interests of the savings association or its members.[16]

In other words, indemnification is required, under this federally mandated scheme, in the circumstance described in subpart (c)(1), but is only permissive in the circumstances described in each of subparts (c)(2)(i)-(iii).

After affording Conway the opportunity to be heard, both the AFC board and the Astoria Federal board denied Conway's request.[17] Both boards treated the request as falling under subpart (c)(2) of the Indemnification Regulation and found that Conway had not acted in good faith within the scope of his employment and could not have reasonably believed that his actions under the circumstances were in the best interests of LISB or its members.

## III.

Conway began this suit on March 22, 2002, seeking indemnification from AFC for costs and attorneys' fees associated with *Doe v. Poe*, the OTS Disciplinary Proceeding, the Criminal Case, the *Weil* Action, and this lawsuit. Conway initially alleged that his claims for indemnification arose under Delaware law, LISB's bylaws, and his employment contract. Conway sought to recover not less than $4,550,000 for the previous suits plus the costs and fees associated with this lawsuit.

AFC filed a motion for summary judgment seeking a dismissal of the complaint. Conway filed a cross-motion for summary judgment seeking reimbursement of approximately $1.825 million in fees and expenses associated the *Weil* Action. In the course of briefing his cross-motion, Conway abandoned his indemnification claims for costs associated with *Doe v. Poe*, the OTS Disciplinary Proceeding, and the Criminal Case. Nevertheless, Conway now argues that his remaining claim for indemnification relating to the *Weil* Action arises under the mandatory indemnification provision of 12 C.F.R. § 545.121(c)(1).[18]

---

**15.** The term "final judgment" is defined in the Regulation as "a judgment, decree, or order which is not appealable or as to which the period for appeal has expired with no appeal taken." 12 C.F.R. § 545.121(a)(1)(iii).

**16.** 12 C.F.R. § 545.121.

**17.** The membership of the AFC board and the Astoria Federal board is identical.

**18.** During the relevant period, LISB's bylaws provided that "[a]ny indemnification by the bank of the bank's personnel is subject to any applicable Board rules or regulations." Ward Aff., Ex. 34, LISB 1982 Bylaws, at Art. 4; *see also* Ward Aff., Ex. 35, LISB 1989 Bylaws, at Art. 4 (same); Ward Aff., Ex. 36, LISB 1993 Bylaws, at Art. 9 (same, but substituting "Office," referring to OTS, for "Board"). "Board" is defined in LISB's federal charter as the FHLBB.

## IV.

### A. *The Parties' Contentions*

Conway contends that he is entitled to mandatory indemnification pursuant to subpart (c)(1) of the Indemnification Regulation. This is so, he argues, because (i) the claims against him in the *Weil* Action were dismissed with prejudice and (ii) a "*dismissal with prejudice*" is synonymous with a "final judgment on the merits" in his favor within the meaning of the Indemnification Regulation. Conway argues by analogy to cases interpreting Federal Rule of Civil Procedure 41, which provides, for *res judicata* purposes, that a claim dismissed with prejudice "operates as an adjudication upon the merits." Thus, because the claim against Conway was dismissed with prejudice and cannot be brought against him again, he argues that he has received a judgment on the merits in his favor for the purposes of the Indemnification Regulation.

AFC contends that Conway is not entitled to mandatory indemnification because, as used in the federal regulation at issue, the phrase "[f]inal judgment on the merits" is intended to exclude situations in which claims are dismissed as a result of a settlement.[19] AFC argues that the legislative history supports this assertion. For example, the Delaware and New York statutes as well as the Model Business Corporation Act require mandatory indemnification for a person who prevails "on the merits or otherwise."[20] In contrast, subpart (c)(2) of the Indemnification Regulation, originally promulgated after the Delaware, New York, and Model Business Corporation Act provisions, treats a judgment "other than on the merits" only as grounds for permissive indemnification.

### B. *Summary Judgment Standard*

A court may grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."[21] The moving party has the burden of showing that no issue of material fact exists.[22] In deciding a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party.[23]

When the moving party has shown that no genuine issue of material fact exists, "the burden shifts to the nonmoving party to substantiate its adverse claim by showing that there are material issues of fact in dispute."[24] It is not enough, however, for the nonmoving party to simply assert the existence of a disputed fact.[25] The fact at issue must be material to the outcome of the case.

## V.

The issue presented is whether for the purposes of the Indemnification Regulation a dismissal with prejudice resulting from a *bona fide* settlement is the same thing as a final judgment on the merits.

---

19. 12 C.F.R. § 545.121(c)(1)

20. N.Y. Bus. Corp. § 724(a) (McKinney 1963) (renumbered § 723 and amended, 1986); 8 Del. C. § 145(c) (1967); Model Bus. Corp. Act § 4A(c) (1967).

21. Ch. Ct. R. 56(c).

22. *Scureman v. Judge,* 626 A.2d 5, 10 (Del.Ch. 1992), *aff'd,* 628 A.2d 85 (Del.1993).

23. *See id.*

24. *Brzoska v. Olson,* 668 A.2d 1355, 1364 (Del.1995) (affirming grant of summary judgment under similarly worded Super. Ct. R. 56).

25. *Id.*

Conway points to Federal Rule of Civil Procedure 41 and recent federal case law as supporting his contention that a "dismissal with prejudice" is the same thing as a "judgment on the merits." [26] For example, in *Semtek Int'l Inc. v. Lockheed Martin Corp.*, the United States Supreme Court stated that " 'an adjudication upon the merits' is the opposite of a 'dismissal without prejudice.' " [27] Conway reasons that if "adjudication upon the merits" is the opposite of "dismissal *without* prejudice," it follows that the ordinary meaning of "dismissal *with* prejudice" is the same as "adjudication on the merits."

■ Despite whatever facial plausibility it may possess, Conway's argument is completely at odds with the overall structure and purpose of the Indemnification Regulation. As the Supreme Court recognized in *Semtek*, a judgment obtained as the result of the payment of money in settlement of a claim is not an "on the merits" adjudication:

> The original connotation of an 'on the merits' adjudication is one that actually 'pass[es] directly on the substance of a particular claim' before the court. That

connotation remains common to every jurisdiction of which we are aware.[28]

The court recognizes that the *Semtek* Court also observed that the meaning of judgment on the merits " 'has gradually undergone change,' and it has come to be applied to some judgments ... that do *not* pass upon the substantive merits of a claim and hence do *not* (in many jurisdictions) entail claim-preclusive effect." [29] But there is no reason to believe that the Indemnification Regulation uses the phrase in this more modern meaning.

Rather, the question is how to interpret this phrase in the context of the Indemnification Regulation as of the time of that regulation's adoption, and in light of its overall structure. The background and structure of the Indemnification Regulation lead the court to conclude that it is not intended to impose mandatory indemnification where the final judgment is the product of a *bona fide* settlement.

The New York and Delaware statutes, enacted in 1963 and 1967 respectively, as well as the Model Business Corporation Act, developed in 1967, require mandatory indemnification when a director has been successful "on the merits or otherwise." [30]

---

**26.** *See, e.g., Paganis v. Blonstein*, 3 F.3d 1067, 1071 (7th Cir.1993) ("involuntary dismissal ... is an adjudication on the merits–in other words, a dismissal with prejudice"); *Dean v. Riser*, 240 F.3d 505, 509 (5th Cir.2001) ("a dismissal with prejudice gives the defendant the full relief to which he is legally entitled and is tantamount to a judgment on the merits") (internal quotation marks omitted); *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir.2002) ("the phrase 'final judgment on the merits' is often used interchangeably with 'dismissal with prejudice' ").

**27.** 531 U.S. 497, 505, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001) (referring to a Rule 41 challenge).

**28.** *Semtek*, 531 U.S. at 501–02, 121 S.Ct. 1021 (citations omitted).

**29.** *Id.* at 502, 121 S.Ct. 1021 (quoting R. Marcus, M. Redish, & E. Sherman, *Civil Procedure: A Modern Approach* 1140–41 (3d ed. 2000)). While articulating a traditional rule regarding judgment on the merits, the Supreme Court makes clear that "judgment on the merits" does not necessarily have an ordinary meaning. The *Semtek* Court noted that when a court does not pass directly on the substance of a claim the Restatement (Second) of Judgments explicitly avoids describing the judgment as " 'on the merits' or as 'operating as an adjudication on the merits ... because of the possibly misleading connotations' " of that terminology. Restatement (Second) of Judgments ¶ 19, Comment a.

**30.** N.Y. Bus. Corp. § 724(a) (McKinney 1963) (renumbered § 723 and amended, 1986); 8 *Del. C.* § 145(c) (1967); Model Bus. Corp. Act § 4A(c) (1967).

In contrast, the Indemnification Regulation, originally promulgated by the FHLBB in 1969, is more narrow, and requires mandatory indemnification only when a director receives a "[f]inal judgment on the merits."[31] The regulation allows for *permissive* indemnification "[i]n case of ... [s]ettlement" or if "[f]inal judgment [is] in [the director's] favor, other than on the merits" when the board finds that the director was acting in good faith.[32]

The Indemnification Regulation was promulgated shortly after the New York, Delaware, and Model Business Corporation Acts. Thus, it is reasonable to conclude the omission of the language "or otherwise" in the mandatory indemnification section and the inclusion of a permissive indemnification section in the case of settlement or for a judgment "other than on the merits" reflects an intentional choice on the part of the promulgating agency. From this, the court concludes that the drafters of the Indemnification Regulation intended to *require* indemnification only when a court passes on the substance of the case and enters judgment in favor of the person seeking indemnification. That did not happen here.

■ Conway contends that because he refused to sign the *Weil* Stipulation, his demand for indemnification is not governed by the provision of § 545.121(c)(2)(i) that relate to indemnification in the case of "settlement." Nevertheless, it is abundantly clear that the dismissal of claims against Conway was entirely the result of the fact that AFC paid a large sum of money to settle *all* the claims in the *Weil* Action. Subpart (c)(2)(i) does not, by its terms, require that the person seeking in-

demnification settle the claims against him or her. Rather, the regulation speaks to settlements in general, making permissive indemnification available to a director "[i]n the case of ... [s]ettlement."[33] The *Weil* Action ended in settlement and the judgment dismissing the claims against Conway was a result of that settlement. For these reasons, the court concludes that Conway's refusal to join that settlement is irrelevant in deciding whether he is entitled to mandatory indemnification under the Indemnification Regulation. Conway's indemnification claim is controlled by § 545.121(c)(2)(i) and indemnification is only available to him at the discretion of the board of directors if the board determines that he "was acting in good faith within the scope of his ... employment."[34]

The OTS's own interpretation of the Indemnification Regulation is consistent with this conclusion. Prior to denying Conway's indemnification request, the AFC board of directors requested an interpretation of § 545.121 from the OTS. In a March 15, 2002 letter, the OTS noted that the Indemnification Regulation allows for permissive indemnification "in the case of settlement, provided certain other requirements are satisfied" and only requires mandatory indemnification "if there is a final judgment on the merits in favor of the ... director."[35] In the OTS's opinion, Conway's case was "not a final judgment on the merits for purposes of 12 C.F.R. § 545.121" and, therefore, Conway was not entitled mandatory indemnification.[36]

■ A federal agency's interpretation of its own regulation is entitled deference "unless plainly erroneous or inconsistent

---

31. 12 C.F.R. § 545.121(c)(1).

32. 12 C.F.R. § 545.121(c)(2)(iii).

33. 12 C.F.R. § 545.121(c)(2)(i).

34. 12 C.F.R. § 545.121(c)(2)(iii).

35. Ward Aff., Ex. 32.

36. *Id.*

with the regulation."[37] In this case, the OTS was interpreting its own regulation and did not have to follow a process outlined in the Administrative Procedures Act to develop its opinion.[38] The OTS's opinion is not plainly erroneous and is consistent with the Indemnification Regulation. Thus, the OTS opinion letter, with which this court's opinion is consistent, is entitled to deference.

■ This decision does not mean, as Conway suggests, that a board of directors could enter into a settlement in bad faith, for the purpose of defeating a legitimate claim for mandatory indemnification under subpart (c)(1). Moreover, a board of directors has an obligation to act in good faith when considering a non-mandatory indemnification request pursuant to § 545.121(c)(2). And, a person who is denied permissive indemnification can file suit against the board and attempt to prove that the board acted improperly or otherwise in bad faith. Here, Conway has not challenged AFC's or Astoria Federal's denial of his indemnification request and, in light of Conway's criminal conviction and the findings in his disbarment hearing,[39] there is no reason to suspect that either board acted in bad faith in denying his request.

## VI.

For the foregoing reasons, AFC's motion for summary judgment is GRANTED and Conway's cross-motion for summary judgment is DENIED. IT IS SO ORDERED.

---

37. *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that an agency's interpretation of a statute that is administers is entitled deference so long as Congress has not directly spoken on the issue).

38. Conway argues that the OTS's opinion letter is not entitled *Chevron* deference because the standard for paying deference to an agency is limited to opinions or decisions arrived at after following a procedure outlined in the Administrative Procedure Act. *See Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). However, both *Christensen* and *Mead* involve an agency interpretation of a statute rather than of a regulation promulgated by the agency.

39. *See In re Conway*, 275 A.D.2d 24, 712 N.Y.S.2d 610 (2d Dept.2000).