# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAPELLA HOLDINGS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 9809-VCS** |
| | : | |
| JAMES THOMAS ANDERSON, | : | |
| | : | |
| Defendant and | : | |
| Counterclaim/ | : | |
| Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CAPELLA HEALTHCARE, LLC, | : | |
| | : | |
| Third-Party Defendant. | : | |

## MEMORANDUM OPINION

Date Submitted:  August 29, 2017
Date Decided:  November 29, 2017

A. Thompson Bayliss, Esquire and Sarah E. Hickie, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware and Jeffrey J. Bushofsky, Esquire and Nicholas M. Berg, Esquire of Ropes & Gray LLP, Chicago, Illinois, Attorneys for Plaintiff/Counterclaim Defendant Capella Holdings, LLC and Third-Party Defendant Capella Healthcare, LLC.

Adam Hiller, Esquire of Hiller Law, LLC, Wilmington, Delaware and C. Mark Pickrell, Esquire of The Pickrell Law Group, P.C., Nashville, Tennessee, Attorneys for Defendant and Counterclaim/Third-Party Plaintiff James Thomas Anderson.

Kevin R. Shannon, Esquire and Frank R. Martin, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Jonathan Rosenberg, Esquire and Nate Asher, Esquire of O'Melveny & Myers LLP, New York, New York, Attorneys for Non-Party Apollo Global Management, LLC.

**SLIGHTS, Vice Chancellor**

Defendant and Counterclaim/Third-Party Plaintiff, James Thomas Anderson, is a former director and officer of Plaintiff, Capella Holdings, LLC, and co-founder of Third-Party Defendant, Capella Healthcare, LLC (together with Capella Holdings, "Capella" or the "Company").[1] In early 2014, Capella was laboring under the weight of substantial debt, and its board of directors (the "Board") feared a possible downgrade of the Company's debt rating by Standard & Poor's. To avoid that consequence, the Board considered two possible solutions: (i) a recapitalization or (ii) a sale of the Company. In April 2014, the Board approved a recapitalization plan whereby preferred shareholders would convert their shares and accumulated interest into common shares. That decision has sparked years-long litigation between Anderson and Capella in two states.

Anderson viewed the recapitalization as a breach of his Senior Management Agreement ("SMA") with Capella.[2] Specifically, he asserted that because the recapitalization would require the Company to issue over 1.1 billion new shares of common stock, the transaction would violate what he viewed as an anti-dilution provision within the SMA. Accordingly, within six days of the Board's approval of the recapitalization, Anderson filed suit against Capella and several individual

---

[1] Capella Healthcare is the wholly owned subsidiary of Capella Holdings. Def. Anderson's Answer to Pls.' Compl. ("Anderson's Answer") ¶ 15.

[2] Pl. Capella Hldgs. LLC's Opening Br. in Opp'n & Cross-Mot. for Summ. J. ("Capella's Br."), Ex. G ("SMA") § 1(k).

defendants in the Court of Chancery of Davidson County, Tennessee for breach of the SMA and breach of fiduciary duty.

Upon reviewing Anderson's Tennessee pleadings, Capella immediately complained that Anderson had disclosed the Company's privileged legal advice and other non-public information and thereby breached both his contractual and fiduciary duties to the Company. This prompted Capella to initiate the present action against Anderson in this Court by verified complaint dated June 20, 2014.

The SMA contains a Delaware choice of law provision. Accordingly, the parties agreed that the Tennessee action should be dismissed and Anderson's claims should be brought in this Court as cross-claims against Capella Holdings and third-party claims against Capella Healthcare. With all claims, cross-claims and third-party claims joined in this action, the parties set about case-dispositive motion practice. In July 2015, this Court granted Capella's motion to dismiss Anderson's fiduciary duty claims against Capella and its directors for failure to state a claim under Court of Chancery Rule 12(b)(6).[3] In this opinion, the Court takes up Capella's motion for summary judgment in which it seeks judgment in its favor on

---

[3] *Capella Hldgs., Inc. v. Anderson*, 2015 WL 4238080, at *7 (Del. Ch. July 8, 2015) ("*Capella I*"). The Third-Party Defendant directors were Daniel Slipkovich, Joseph Nolan, David Donnini, Joshua Earl and Robert Hensley ("Director Defendants"). Anderson asserted fiduciary duty claims against these Defendants in Counts I–III of his Third-Party Complaint. *Id.* at *5–6.

2

Anderson's remaining contract claims against Capella and on Capella's claims for breach of contract and breach of fiduciary duty against Anderson.[4]

Capella's motion, while addressing both Anderson's claims of breach and its own claims of breach against Anderson, turns on a single, two-part issue—whether Section 1(k) of the SMA contains an anti-dilution provision and, if so, whether Capella violated that provision by completing the recapitalization in April 2014. If yes, then summary judgment is not available to Capella since material issues of fact remain in dispute regarding whether the recapitalization caused improper dilution of Anderson's holdings and whether that prior breach excused any breach of confidentiality by Anderson. If no, then the facts are undisputed that Anderson breached his contractual and fiduciary duties to maintain the Company's confidences and Anderson may not excuse that breach by pointing to a prior breach of the SMA by the Company.

For the reasons discussed below, I have determined that Section 1(k) does not contain an anti-dilution provision. Since the existence of an anti-dilution provision within the SMA is the foundation upon which Anderson's claims and defenses rest, and that foundation is illusory, the bases for Anderson's resistance to Capella's motion for summary judgment crumble. Accordingly, Capella's motion for

---

[4] Anderson moved for summary judgment first, prompting Capella's cross-motion, but, as discussed below, Anderson withdrew his motion following the completion of briefing.

summary judgment on Anderson's remaining breach of contract claims against Capella must be GRANTED. Capella's motion for summary judgment on its breach of contract claims against Anderson must also be GRANTED. Its breach of fiduciary duty claim against Anderson, however, is duplicative of its breach of contract claims, and therefore Capella's motion is DENIED as to that claim. Because Capella cannot prevail on its fiduciary duty claim as a matter of law, that claim is DISMISSED.

## I. FACTUAL BACKGROUND

I have drawn the facts from the admissions in the pleadings, uncontested facts presented in the parties' submissions and those matters of which the Court may take judicial notice. The Court's decision in *Capella I* provides a detailed background of the parties and their relationships with one another so I will not repeat that detail here.[5] Instead, I will focus this statement of facts on the claims and defenses that arise under the SMA.

### A. Section 1(k) of the SMA

On May 4, 2005, Anderson executed the SMA, which is by and among Anderson, Capella Holdings and Capella Healthcare. The SMA governs various aspects of the parties' relationship. Of particular relevance here, Section 1, entitled

---

[5] *Capella I*, 2015 WL 4238080, at *1–3.

"Purchase and Sale of Executive Securities,"[6] at subsection (k), provides the following:

> The Company [Capella] shall reserve 2,211,688 additional shares of Common Stock (the "Additional Common Stock") for issuance (whether through restricted stock, upon exercise of options or otherwise) to other executives and employees of the Company and its Subsidiaries after the date hereof (including executives and employees of acquired companies); provided that in the event that any portion of such Additional Common Stock are not issued prior to the earliest to occur of (x) the redemption of all issued and outstanding Preferred Stock, (y) a Sale of the Company or (z) an initial Public Offering, the Board in its sole discretion may issue any or all of the remaining shares of Additional Common Stock to the executives of the Company or its Subsidiaries (including [Anderson]) in the amounts determined by the Board. Any shares of Additional Common Stock not allocated by the Board to executives and employees of the Company and its Subsidiaries pursuant to the immediately preceding sentence shall remain unissued.[7]

As this Section makes clear, Capella committed to reserve a pool of 2,211,688 shares, defined as the "Additional Common Stock," for the purposes of employee and executive compensation, subject to certain specified restrictions.[8] Any shares from this pool not issued to "executives and employees" would "remain unissued."[9]

---

[6] SMA § 1.

[7] § 1(k).

[8] *Id.*

[9] *Id.*

## B. The Alleged Breaches

Leading up to 2014, Capella had accumulated over $500 million in debt,[10] and a private equity investor, GTCR Golder Rauner II L.L.C. ("GTCR"), held preferred shares valued at approximately $206 million with an accumulated in-kind interest of approximately $143 million.[11] One way to retire some of this debt to avoid a ratings downgrade was to pursue a recapitalization whereby GTCR's preferred shares would be converted into common shares.[12] The recapitalization would result in the Company issuing over 1.1 billion common shares.[13] All Company executives were

---

[10] Capella's Br., Ex. A ("Anderson Dep.") at 192:16–193:8. (testifying as to Standard & Poor's opinion regarding debt-to-equity conversion); Anderson's Answer ¶¶ 31–33; Def. Anderson's Countercl. & Third-Party Compl. ("Anderson's Countercl.") ¶¶ 18–19, 37; Capella's Br., Ex Q ("Board Meeting Presentation" dated Feb. 19, 2014) at Capella-0000367 ("A conversion to common would . . . [r]educe the company's debt leverage in the eyes of the ratings agencies, who view Preferred Equity as debt. *Note: ratings agencies have indicated no downgrade would be required if the recapitalization takes place.*") (emphasis in original); Anderson Dep. at 175:23–25 (admitting that the Company had "$500 million" in debt); Ex. C at 113:14–17 (Joseph Nolan Dep.) (testifying to the Company having "$500 to $550 million" in debt).

[11] Anderson's Answer ¶ 25; Anderson's Countercl. ¶¶18–19. Standard & Poor's considered GTCR's preferred shares to be "quasi-debt" that may affect the Company's ratings. Anderson Dep. at 192:16–193:8.

[12] Board Meeting Presentation at Capella-0000367–0000372 (noting that the preferred stock conversion "to common would provide a number of benefits to the Company . . . [including] [r]educ[ing] the company's debt leverage in the eyes of the ratings agencies").

[13] Anderson's Countercl. ¶ 44; Board Meeting Presentation at Capella-0000388 (showing that the Board contemplated issuing 1,179,042,971 common shares).

permitted to join in the recapitalization, but Anderson declined to participate.[14] The Board voted to approve the recapitalization plan in April 2014, with only Anderson dissenting.[15]

Anderson responded to the Board's approval of the recapitalization plan by filing suit against Capella and several of its directors in the Chancery Court of Davidson County, Tennessee on April 23, 2014.[16] The basis of Anderson's suit was that the Board violated Section 1(k) of the SMA when it approved the recapitalization because his ownership interest was diluted as a result of the transaction.[17] Anderson included highly sensitive information in his Tennessee complaint, including legal advice provided to the Board and details of a non-public bidding process regarding a potential sale of the Company conducted by Bank of America.[18] Anderson did not seal his filings or seek to obtain a confidentiality order from the court, even though the court rules provided a process whereby he could

---

[14] Anderson Dep. at 194:15–21.

[15] Anderson's Answer ¶ 44.

[16] Capella's Br., Ex. F (Pl. Anderson's Compl., No. 14-592-I (Davidson Cty., Tenn., Apr. 23, 2014)).

[17] *Id.* ¶¶ 107–11.

[18] *Id.* ¶¶ 16–23, 29–31, 51–52.

have sought to protect the confidential information from public exposure.[19]  Indeed, Anderson admits that he made no effort to avail himself (or the Company) of these processes.[20]    Capella treated Anderson's public disclosure of confidential information as a material breach of Section 7(a) of the SMA, and it terminated him

---

[19] Tenn. R. Civ. P. 26.03(7) (providing that a court may, upon a showing of good cause, issue an order "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way"); Tenn. Twentieth Dist. Ct. R. of Prac. § 7.02 ("All papers, documents and files shall be available for public inspection except as specifically exempted by court order or statute.  The motion seeking such an order must contain sufficient facts to overcome the presumption in favor of disclosure.").

[20] Specifically, Anderson admitted in his deposition that (i) he had obligations to maintain certain information as confidential under the SMA, (ii) he believed that his confidentiality obligations ended once his shares were diluted, (iii) he made absolutely no effort to keep privileged and non-public information confidential and (iv) he disclosed privileged and non-public information in his Tennessee complaint.  Anderson Dep. at 53:10–55:24; *see also id.* at 49:23–50:10 (admitting that he did not clear his disclosures with anyone at Capella before filing his complaint).

for "Cause" under Section 9.[21]  Thereafter, Capella took the position that Anderson

was not entitled to severance pay under Section 6(e) of the SMA.[22]

### C. Procedural History

Capella followed its termination of Anderson by filing suit against him in this

Court on June 20, 2014, in which it asserts claims for (i) breach of fiduciary duty;

(ii) breach of contract for failing to comply with a repurchase notice; (iii) breach of

contract for disclosing confidential information; and (iv) breach of contract for

failing to return confidential materials.  Soon after, Anderson voluntarily dismissed

his Tennessee complaint and filed his Answer, Counterclaims and Third-Party

Complaint against Capella and its directors in this Court in which he restates the

claims he brought in his Tennessee complaint: (i) breach of fiduciary duty and

(ii) breach of contract for diluting his ownership interest.  In addition to these

---

[21] Capella's Br., Ex. H–J (letters from Capella to Anderson providing notice of breach and terminating him for breach); SMA § 7(a) (providing that all "information, observations and data obtained by [Anderson] during the course of his performance under this Agreement" is "Confidential Information"); SMA § 9 ("'Cause' means . . . (iv) a breach of [Anderson's] duty of loyalty to the Company, Employer or any of their respective Subsidiaries or Affiliates or any act of fraud or material dishonesty with respect to the Company, Employer or any of their respective Subsidiaries or (v) any material breach of th[e] [SMA] or any other agreement between [Anderson] and the Company, Employer or any of their respective Affiliates which is not cured within 15 days after written notice thereof to Executive.").

[22] Capella's Br., Ex. T ("Amend. No. 2 to SMA") § 6(e) (providing that Anderson is not entitled to severance pay if the Company terminates him for "Cause" as defined in Section 9 of the SMA).

9

restated claims, Anderson asserts a new breach of contract claim against Capella for failure to make severance payments.

Capella and the Director Defendants moved to dismiss Anderson's Counterclaims and Third-Party Complaint under Court of Chancery Rule 12(b)(6). The Court granted that motion as to Anderson's fiduciary duty claims (Counts I–III), but denied it as to his breach of contract claims (Counts IV–V).[23]  In doing so, the Court observed that Capella's reading of Section 1(k) (the purported anti-dilution clause) "appears more promising, but Anderson's allegations . . . [are] at least reasonable at this stage."[24]

On May 12, 2017, Anderson filed a motion for partial summary judgment with regard to his remaining breach of contract claims, and Capella followed by filing a cross-motion for summary judgment.  Both sides argued that Section 1(k) unambiguously supports their respective positions with respect to breach of contract. Anderson, in fact, was so confident that his interpretation of Section 1(k) would win the day that he chose to rest his entire defense to Capella's contract claims against him on the prior breach doctrine.[25]  Specifically, he argued in his motion for

---

[23] *Capella I*, 2015 WL 4238080, at *7.

[24] *Id.*

[25] *See Medicalgorithmics, S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *24 (Del. Ch. Aug. 18, 2016) ("A party is excused from performance under a contract if the other party is in material breach thereof.") (citation omitted).

summary judgment that Capella's prior material breach of Section 1(k) of the SMA excused his later breach of Section 7(a) of that same contract.[26]  After Anderson received Capella's moving papers, however, he withdrew his motion for partial summary judgment.[27]  He now argues that Section 1(k) is ambiguous and that the Court must receive extrinsic evidence to construe its terms.[28]  Capella's motion for summary judgment remains, and it covers all pending claims and defenses asserted by all parties.  This is the Court's decision on that motion.

## II. ANALYSIS

I first address whether Section 1(k) provides Anderson with anti-dilution protection and conclude that it does not.  With this finding in place, I turn to

---

[26] *See id.*  Anderson also needs the Court to find a prior breach by Capella in order to avoid liability for Capella's claim for breach under Section 3 (as amended) regarding Anderson's failure to comply with a repurchase notice.  SMA § 3 (providing that, "in the event of a Separation," Anderson must allow the Company to repurchase his shares); Capella's Br., Ex. U ("Amend. No. 1 to SMA") (amending Section 3 subsections (b) and (c), but still allowing the Company to repurchase shares "in the event of a Separation").  The record evidence is undisputed that Anderson has not permitted the Company to repurchase his shares following his separation.  Anderson Dep. at 147:20–25 (stating that Capella has a right to repurchase his shares if he is terminated for cause), 148:1–150:4 (stating his belief that Capella's rights did not trigger because he was not terminated for cause), 207:12–20 (admitting he received Capella's repurchase notice).

[27] Def. Anderson's Reply Br. Regarding Cross-Mots. for Summ. J. ("Anderson's Reply Br.") at 2–4; *see also* Transcript of Oral Argument on Capella's Mot. for Summ. J. ("Tr.") at 7:2–17 (formally withdrawing the motion for partial summary judgment at oral argument).

[28] *Id.*

11

Anderson's breach of contract claims and his prior breach defense and conclude that both fail as a matter of law.

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[29] If the moving party demonstrates that "no genuine issues of material fact [are] in dispute, [then] the burden shifts to the non-moving party to demonstrate that there are genuine issues of material fact in dispute that must be resolved at trial."[30] "It is not enough, however, for the nonmoving party to simply assert the existence of a disputed fact."[31] He must, instead, support that position with competent record evidence.[32]

"When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous."[33] In this regard, the court will reject a party's proffered interpretation of contract

---

[29] Ct. Ch. R. 56(c).

[30] *Grabowski v. Mangler*, 956 A.2d 1217, 1220 (Del. 2008) (citing *Grabowski v. Mangler*, 938 A.2d 637, 642 (Del. 2007); *Moore v. Sizemore*, 405 A.2d 679, 681 (Del. 1979)).

[31] *Conway v. Astoria Fin. Corp.*, 837 A.2d 30, 36 (Del. Ch. 2003) (citing *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995)).

[32] *Id.*

[33] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

language if that construction will yield "an absurd result or is one that no reasonable person would have accepted when entering the contract."[34]

## B. Section 1(k) Does Not Provide Anti-Dilution Protection

Section 1(k) begins by defining "Additional Common Stock": "The Company shall reserve 2,211,688 additional shares of Common Stock (the "Additional Common Stock") for issuance . . . to other executives and employees of the Company and its Subsidiaries after the date hereof . . . ."[35] Nothing in this language remotely suggests that the referenced 2.2 million shares (the "Additional Common Stock") are all that the Company may issue under any circumstances. Rather, the language simply provides that the Additional Common Stock will be "reserve[d]" for "other executives and employees"—meaning not Anderson.[36]

Section 1(k) goes on to set forth the circumstances under which the Board may issue additional available shares from this pool, which were not issued before certain designated events, to executives and employees, including Anderson:

> . . . provided that in the event that any portion of such Additional Common Stock are not issued prior to the earliest to occur of (x) the redemption of all issued and outstanding Preferred Stock, (y) a Sale of the Company or (z) an initial Public Offering, the Board in its sole discretion may issue any or all of the remaining shares of Additional

---

[34] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (citations omitted).

[35] SMA § 1(k).

[36] *Id.*

Common Stock to the executives of the Company or its Subsidiaries (including [Anderson]) in the amounts determined by the Board.[37]

Here again, this language cannot reasonably be read to limit the Company's ability to issue common shares outside of the pool of Additional Common Shares; it simply provides that if one of the specified events occurs (*e.g.*, an IPO), then the Board may issue any or all remaining shares from the Additional Common Stock pool to Capella's executives and employees ("including [Anderson]").[38]  The anti-dilution language that Anderson strains to see in these initial passages of Section 1(k) is simply not there.[39]  To the contrary, the language reveals that the parties contemplated the Company might issue additional common shares, beyond the Additional Common Stock, in connection with a sale of the Company or an IPO. Indeed, the Board's authority to issue any remaining shares of Additional Common Stock under Section 1(k) was expressly tied to those events.[40]

---

[37] *Id.*

[38] *Id.*

[39] *See Choupak v. Rivkin*, 2015 WL 1589610, at *3 (Del. Ch. Apr. 6, 2015) ("Anti-dilution comes in multiple forms, with weighted-average and full-ratchet protection being the most common.  When stock option agreements, warrants, certificates of designation, and other corporate documents provide for anti-dilution protection, they establish triggering events, formulas for the calculations, and implementing procedures."), *aff'd*, 129 A.3d 232 (Del. 2015) (TABLE).  None of these formulations appear in Section 1(k).

[40] SMA § 1(k).

Not surprisingly, Section 1(k)'s final clause does not provide anti-dilution protection either. The final clause states: "Any shares of Additional Common Stock not allocated by the Board to executives and employees of the Company and its Subsidiaries pursuant to the immediately preceding sentence shall remain unissued."[41] The plain import of this language is that if there are any shares in the pool of Additional Common Stock that are not issued to executives or employees, then those shares "shall remain unissued."[42] This merely confirms that the Board may not issue stock from the reserved pool of Additional Common Stock unless it does so as part of the executive compensation plan.[43] This language says nothing of the Company's ability to issue stock outside of the executive incentive compensation regime set forth in Section 1(k), and it certainly does not provide any form of anti-dilution protection.

Capella's interpretation of Section 1(k) fits perfectly with the stated purpose of the provision and of the SMA as a whole. Section 1(k) appears in the first part of the SMA entitled "Provisions Related to Executive Securities," and within the first subpart entitled "Purchase and Sale of Executive Securities."[44] The term "Executive

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.* § 1; *see also Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 n.35 (Del. Ch. 1998) ("Although contract headings are not controlling evidence of the meaning of a

Securities" is defined in the opening provisions of the SMA as "[a]ll Preferred Stock and Common Stock acquired by [Anderson]."[45]  That was the point of the SMA—to address Anderson's executive compensation.[46]  Anderson's *ex post* attempt to expand the reach of the SMA as a means to restrict the Company's ability to issue shares or other securities in other scenarios is not supported by the language of the contract and cannot be countenanced.

Anderson argues that the Court can find the hidden anti-dilution protection in Section 1(k) by considering that the provision "starts with the specialized term, 'Any.'"[47]  According to Anderson, a construction of Section 1(k) that does not acknowledge that the Company is restricted from issuing "any" further common stock would render the term "any" mere surplusage.  In support of this construction,

---

contract's substantive provisions, they may be considered as additional evidence tending to support the substantive provisions.").

[45] SMA (Recitals).

[46] *E.g.*, § 1(k) (discussing the issuance of securities to executives generally and Anderson specifically).

[47] Anderson's Reply Br. at 4–5 ("Capella does not explain the effect of Paragraph 26 on Section 1(k)—the key contractual provision in this case that starts with the specialized term, 'Any'. . . .  The simple fact remains that, in the key parts of the contract, the parties both capitalized the words 'Additional Common Stock' and said that the phrase '[a]ny shares of Additional Common Stock' 'shall not be exclusive.'  Mr. Anderson's interpretation of the contract gives a logical meaning to the entirety of Paragraph 1(k), as well and Paragraph 26."); *see also* Def. Anderson's Opening Br. in Supp. of Mot. for Partial Summ. J. ("Anderson's Opening Br.") 14 (discussing how "Any" shares of "Additional Common Stock" means common stock generally).

Anderson points to two additional contract provisions, one within the SMA (Section 11(c)) and one within the Shareholder Agreement by and among Capella, GTCR and others (including Anderson).[48] Anderson refers to Section 11(c) of the SMA for the simple reason that it incorporates by reference the Shareholder Agreement. He then refers to Section 26 of that agreement, which provides (in relevant part): "The use of the words 'or,' 'either,' and 'any' shall not be exclusive."[49] From there, Anderson invites the Court to leap to the conclusion that Section 1(k) provides anti-dilution protection, or is, at least, ambiguous in that regard. The invitation is declined.

Anderson is correct that Section 1(k)'s reference to "any" is "not exclusive"; it means, with regard to the Additional Common Stock, one, some, many or all of the shares within the reserved pool.[50] But that is as far as Anderson's construction

---

[48] SMA § 11(c) ("This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way."); Anderson's Opening Br., Ex. 3 ("Shareholder Agreement").

[49] Shareholder Agreement § 26.

[50] The common definition of "Any" comports with Section 26 of the Shareholder Agreement. *See Any Definition*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/any ("Definition of Any: one or some indiscriminately of whatever kind; one, some, or all indiscriminately of whatever quantity; unmeasured or unlimited in amount, number, or extent").

can go.  Beyond that, Anderson's construction of Section 1(k) creates unreasonable surplusage.[51]  Specifically, the defined term "Additional Common Stock" (which is expressly limited to the reserved pool) would be meaningless because, according to Anderson, "any" (being a "specialized" non-exclusive term) must refer to all common stock of the Company that could ever be issued.  That is not what Section 1(k) says and, therefore, not what it means.  Anderson's proffered construction would allow an expressly limited executive compensation provision to be transformed into a wholesale restriction on the Company's right to issue stock— an absurd result.[52]

Capella offers the only reasonable interpretation of Section 1(k)—that is, it establishes a pool of shares reserved for executive compensation.  Anderson conceded at oral argument that Section 1(k) addresses executive compensation.[53] And he admits (at least implicitly) that Capella's interpretation is reasonable by arguing in his reply brief that, in light of Capella's arguments, the SMA must be

---

[51] *See Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("[The courts] will read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

[52] *See Osborn*, 991 A.2d at 1160 (discussing the rule against interpretations that lead to absurd results).

[53] Tr. at 42:24–43:5 ("The parties all agreed 'We are okay with an executive compensation stock plan that will be capped at 2,211,688 shares.'").

18

ambiguous.[54]  There is no ambiguity, however, because only Capella's construction is reasonable.[55]  Accordingly, Capella's motion for summary judgment on Anderson's remaining counterclaims and third-party claims for breach of the SMA must be GRANTED.[56]

---

[54] Anderson's Reply Br. at 3–4.  *See also Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.").

[55] I note that in *Capella I* the Court observed that Anderson's construction of Section 1(k) was "at least reasonable at [the pleadings] stage."  *Capella I*, 2015 WL 4238080, at *7. I inquired at oral argument on Capella's motion for summary judgment whether this observation was law of the case. Tr. at 13:3–11, 30:21–35:16.  Anderson's counsel replied that he deliberately elected not to press any argument under the law of the case doctrine in his briefs, and then acknowledged that Anderson was not asserting that the law of the case doctrine should affect the Court's construction of Section 1(k).  Tr. at 31:1–35:16.

[56] Anderson offered no response to Capella's argument that he had not supported his claim of breach relating to the Company's failure to pay severance compensation.  Anderson's Countercl. ¶¶ 119–34 (Count V).  Capella's argument was well-supported in the language of the SMA, in the record of sworn testimony and in the law.  *See* Amend. No. 2 to SMA (providing that Anderson is not entitled to severance if the Company terminates him for "Cause"); SMA § 9 (defining "Cause" as a material breach of the SMA or a breach of the duty of loyalty); § 7(a) (providing that all "information, observations and data obtained by [Anderson] during the course of his performance" is "Confidential Information" and he must "use all reasonable efforts to obtain confidential treatment of such information."); Anderson Dep. at 49:23–50:10, 53:10–55:23 (admitting that he disclosed confidential information to advance his personal interests and made no effort to keep the information confidential); *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *17–19 (Del. Ch. Oct. 4, 2013) (holding that breach of a confidentiality provision was a material breach of contract); *Hollinger Int'l v. Black*, 844 A.2d 1022, 1061–62 (Del. Ch. 2004) (holding that director breached his duty of loyalty by disclosing confidential company information).  Having failed to meet his shifted burden to demonstrate a genuine dispute of material fact on the severance issue, Anderson has, in essence, conceded that summary judgment as to this issue is appropriate.  *See Grabowski*, 956 A.2d at 1220 (discussing burden-shifting in a motion for summary judgment); *Conway*, 837 A.2d at 36 (same).

## C. Judgment Must be Entered on Capella's Claims Against Anderson

After deciding that Capella did not breach Section 1(k) by executing the recapitalization, I must grant Capella's motion for summary judgment on its breach of contract claims against Anderson. For its part, Capella supported its breach claims against Anderson with a reasonable interpretation of the relevant contracts (that prohibit the release of confidential information) and citations to Anderson's sworn testimony where he acknowledged releasing the Company's confidential information in his Tennessee complaint without permission.[57] Thus, Capella satisfied its burden under Rule 56, and the burden shifted to Anderson to demonstrate the existence of genuine disputes of material fact.[58]

Anderson did not carry his burden. He raised no argument in response to Capella's motion apart from his unreasonable construction of Section 1(k) and his argument that Capella's prior breach of that provision excused him from any obligation to comply with his contractual confidentiality obligations. In fact, in his opening brief in support of his motion for partial summary judgment (which he later withdrew), and in his opposition to Capella's cross-motion, Anderson raised just one defense to the Company's claims—the prior breach doctrine.[59] Having determined

---

[57] The Court has cited to Capella's proofs throughout this decision.

[58] *See Grabowski*, 956 A.2d at 1220; *Conway*, 837 A.2d at 36.

[59] Anderson stated in his reply brief, "it would be laborious and burdensome on the Court to list all the discrepancies among, and contradictions within, the witnesses' testimony to

that Capella committed no breach, I cannot accept Anderson's prior breach defense as a matter of fact or law. Accordingly, the Court must grant summary judgment to Capella on its Counts II–IV.[60]

Anderson has not raised any meaningful argument in defense of Capella's breach of fiduciary duty claim.[61] Even so, I deny Capella's motion for summary judgment as to that claim because it is wholly duplicative of Capella's breach of contract claims.[62] Indeed, that claim must be dismissed as it is not cognizable when

---

date. The truth will come out at trial." Anderson's Reply Br. at 5; *see also* Anderson's Opening Br. at 18 n.5 ("Mr. Anderson holds other defenses to the claims asserted by Capella, which he reserves the right to raise at trial."). In "reserving his rights," Anderson chose to assume that this case was destined for trial. He chose poorly, and the time to present genuine disputes of material fact has now passed. *See Grabowski*, 956 A.2d at 1220; *Conway*, 837 A.2d at 36.

[60] Count II is Capella's claim that Anderson failed to comply with Capella's repurchase notice, as required by Section 3 (which he admitted—Anderson Dep. at 147:20–149:17, 207:12–20); Count III is Capella's claim for breach of Section 7(a) for disclosure of confidential information; and Count IV is Capella's claim that Anderson has retained confidential information (which he has admitted—Anderson Dep. at 33:23–34:17, 72:2–19, 79:11–24) in violation of Section 7(a).

[61] *See* Pl. Capella Holdings LLC's Compl. ¶¶ 78–81 (Count I).

[62] I am satisfied that the undisputed record evidence demonstrates that Anderson breached his fiduciary duty of loyalty by disclosing confidential information to advance his personal interests without making any effort whatsoever to maintain confidentiality. *See, e.g.*, *Triton Constr. Co. v. E. Shore Elec. Servs. Inc.*, 2009 WL 1387115, at *11, 15 (Del. Ch. May 18, 2009) ("Fiduciary duties may arise . . . when an employee acquires secret information relating to his employer's business. Whether or not the information rises to the level of a trade secret, an employee has a fiduciary duty to safeguard that information . . . . An agent has a duty not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party."); *Hollinger Int'l*, 844 A.2d at 1061–62 (holding that defendant director breached his fiduciary duty of loyalty by disclosing confidential company information to advance personal interests).

pled in conjunction with a breach of contract claim that shares the same factual predicate.[63]

## III. CONCLUSION

Based on the foregoing, Capella's motion for summary judgment as to all claims arising from the SMA is GRANTED. Capella's motion for summary judgment as to its breach of fiduciary duty claim is DENIED and that claim is DISMISSED. Capella shall submit an implementing order within ten (10) days, on notice to Anderson. The implementing order shall include a proposed schedule for further proceedings.

---

Nevertheless, the Court cannot grant judgment on Capella's fiduciary duty claim. The same factual predicate that animates Capella's breach of fiduciary duty claim is also at the heart of its claim that Anderson breached Section 7(a) of the SMA by disclosing the same confidential information in the same manner (*i.e.*, Anderson's filing of the Tennessee complaint). The claims, therefore, are duplicative. *See Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015) ("Delaware respects the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations and does not allow fiduciary duty claims to proceed in parallel with breach of contract claims unless there is an independent basis for the fiduciary duty claims apart from the contractual claims.") (citations omitted) (internal quotation marks omitted).

[63] *See Renco Gp., Inc.*, 2015 WL 394011, at *7; *see also Stroud v. Grace*, 606 A.2d 75, 81 (Del. 1992) ("[I]n the interests of judicial economy, Court of Chancery Rule 56 gives th[e] court the inherent authority to grant summary judgment *sua sponte* against a party seeking summary judgment.") (citing *Bank of Del. v. Claymont Fire Co. No. 1*, 528 A.2d 1196, 1999 (Del. 1987)).